WADOZ and wife, Appellants, vs. UNITED NATIONAL INDEMNITY COMPANY and others, Respondents.

*December 4, 1956—January 7, 1957.*

384

For the appellants there was a brief by *Backus & Waters,* and oral argument by *Douglas J. McClelland,* all of Milwaukee.

For the respondents Allstate Insurance Company and Beverly Ann Wadoz there was a brief by *Kivett & Kasdorf,*

attorneys, and *A. W. Kivett* and *H. A. Dall* of counsel, all of Milwaukee, and oral argument by *Mr. Dall.*

STEINLE, J.    It appears without dispute that at the time of the collision the defendant Beverly Ann Wadoz was twenty years and six months of age.  Before she became eighteen years of age, she had requested permission from her father to enter a convent, which request he declined.  The daughter told the father that while he still had jurisdiction over her at the time, nevertheless, when she became eighteen years of age she would be "on her own" and could do as she pleased. In August, 1950, after the daughter reached the age of eighteen, she entered a convent, and the father paid for her dowry there and also for some books that she desired.  She remained in the convent until August, 1952.  After leaving, she returned to the home of her parents, where she has since resided, the father providing for her maintenance.  Shortly after she returned home, she obtained employment at the State Fair park, worked there during the balance of the vacation period, and retained her earnings.  Subsequently she enrolled at Marquette University and was a student there at the time in question, her father paying for the tuition and books, and permitting her the use of an automobile.  The father claimed her as an income-tax dependent.  He paid for the hospital and medical expense arising out of injuries sustained by her in the collision.

At the trial the father testified that he had no control over the daughter after she became eighteen years of age; that thereafter she came and went as she pleased; that while he charged her for room rent and for board, he did not collect any money from her for such purpose; that before she became eighteen years of age, he required her to turn in her earnings which were put in the family budget, but thereafter she did what she pleased with her earnings; that he signed some papers for her admission to the convent which she took with

her when she entered there, but which have not been available to him.

Evidence was presented on behalf of the daughter and the carrier of the insurance on the Wadoz car, that after the daughter returned from the convent she helped with the housework at home; that parental permission was not required by the authorities of the convent when the daughter entered there, and that no waiver by the parents of their right to custody, earnings, or obligations to or on her behalf was required or given; that girls entering the Order which Beverly Ann joined, remain under parental control until they become twenty-one years of age; that during a girl's minority while at the convent, parents, if in a position to do so, are expected to pay for their daughter's medical expense; that during a daughter's minority while at the convent, should the parents need her support, she would be advised by the authorities to return to her home; that there is a mutual agreement between the Order and the parents to the effect that the parents may be asked to make certain payments or give some help.

It is the plaintiff's position that the evidence conclusively indicates that the daughter became completely emancipated before she entered the convent, such emancipation resulting from an understanding between her father and herself that she was to be free to do as she chose when she attained the age of eighteen years, and further, that such emancipation could not under law be revoked or rescinded thereafter. The defendants Beverly Ann Wadoz and Allstate Insurance Company maintain that the evidence does not establish that Beverly Ann became emancipated when she attained the age of eighteen years, and that her unemancipated status continued while she was in the convent, and existed at the time of the collision in question. In the alternative they assert that had there been emancipation at or immediately before the time that she entered the convent, such status was rescinded by

mutual assent of daughter and parent when she left the convent and returned home, and that she was in an unemancipated status at the time of the collision.

When determining the motion for directed verdict the trial court expressed views as follows:

"Now the question arises whether or not the child, having been emancipated, and assuming for the sake of this motion here that she was emancipated, wholly emancipated, whether or not under those circumstances that emancipation is final, [whether] it is irrevocable, regardless of what the parties themselves desire to do,—the child and the father. . . .

"I know it is important to the parties here, but I am satisfied in my own mind that there is nothing left here for the jury at all. The facts are uncontradicted that this young lady came home of her own will and volition; that the father received her. We are concerned in the question as to whether or not she was emancipated at the time when this accident happened.

"In the opinion of the court, there is no question but what she was unemancipated; that because she consented and the father consented, her prior status of unemancipation reverted back again. This is like a contract which may be rescinded by the consent of both parties, or like a gift which may, of course, be nullified by the consent of the donee."

We are thus confronted with the questions (1) whether the evidence establishes that emancipation existed, and (2) if emancipation did exist, could it under the law be rescinded, and if so, was it rescinded.

To emancipate means to free or release a child from the parental power, making the person released *sui juris. Groh v. W. O. Krahn, Inc.* (1937), 223 Wis. 662, 669, 271 N. W. 374. "Emancipation," as the term is used in the law of parent and child, means the freeing of the child for the period of its minority from the care, custody, control, and service of its parents. 67 C. J. S., Parent and Child, p. 811, sec. 86. See also the approved instruction in *Patek v. Plankinton Packing Co.* (1923), 179 Wis. 442, 448, 190 N. W. 920.

Emancipation of a minor may be partial or complete, express or implied. 67 C. J. S., Parent and Child, p. 812, sec. 87. Complete emancipation gives to the minor his time and earnings and does away with the parent's right of custody and control. 39 Am. Jur., Parent and Child, p. 707, sec. 66. The child may be emancipated for the balance of its minority or for a shorter period, and conditionally or unconditionally. 67 C. J. S., Parent and Child, p. 812, sec. 88 a. Emancipation occurs where the parent renounces all the legal duties and voluntarily surrenders all the legal rights of his position to the child or to others. In determining whether a child has been emancipated, the intention of the parent governs. 67 C. J. S., Parent and Child, pp. 812, 813, sec. 88 b. Whether a child has been emancipated must be determined largely on the peculiar facts and circumstances of each case, and therefore is ordinarily a question for the jury. 39 Am. Jur., Parent and Child, p. 705, sec. 64. Whether there has been an emancipation is a question of fact, but what is emancipation is a question of law. *Iroquois Iron Co. v. Industrial Comm.* (1920), 294 Ill. 106, 128 N. E. 289, 12 A. L. R. 924. In *Patek v. Plankinton Packing Co., supra,* it was said (p. 451) : "All the facts relating to emancipation were before the jury and it was a question of fact for them to decide."

In support of their contention that emancipation was established, the plaintiffs direct attention to the father's testimony concerning the daughter's assertion that he would no longer have jurisdiction over her when she became eighteen years of age, and that in fact he did not exercise control over her after she reached that age. Further, that while he prevented her from entering the convent before she was eighteen years of age, he made no effort to do so after she attained such age. Further, that after she became eighteen years of age she retained her earnings, whereas previously she was obliged to deliver her earnings to the parents. On the other hand, the defendants-respondents in support of their position that eman-

cipation did not exist, point to the evidence that no waiver of parental right was required of them by the Order, but that on the contrary the evidence indicated that as far as the Order was concerned, parental control would have continued until the girl reached the age of twenty-one years had she remained in the convent, and that she was free to return to the custody of the parents and aid in their support if she so desired. Further, that she did return and was cared for by the father, and that she had no earnings other than a small amount of money received during a vacation period, which sum and the privilege to use it as she chose, under the rule of *Tande v. Vernon County* (1938), 226 Wis. 602, 276 N. W. 359, did not of itself establish emancipation. In the *Tande Case* at page 612, this court said:

"They [both boys] attended the same [the high school] the school year preceding the accident and the school year following. During the vacation time, they did such work as they were able to procure, and no doubt retained a part or all of their earnings from such employment; but we cannot conclude from this meager evidence, and hold, as a matter of law, that their status was that of emancipated minors."

Each side has advanced other considerations in support of its respective position as to the question of whether emancipation existed or did not exist. Those items which have been detailed are sufficient to indicate the conflict in the reasonable inferences that could be drawn with respect to the issue. It does not appear that unbiased and impartial minds could come to but one conclusion upon the evidence presented. Manifestly the question of whether emancipation existed was for the jury.

A verdict may properly be directed only when the evidence gives rise to no dispute as to material issues, or only when the evidence is so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one con-

clusion. *Rusch v. Sentinel-News Co.* (1933), 212 Wis. 530, 250 N. W. 405.

If the evidence is conflicting, or if the inferences to be drawn from the credible evidence are doubtful and uncertain, and there is any credible evidence which under any reasonable view will support or admit of an inference either for or against a claim or contention of any party, then the rule that the proper inference to be drawn therefrom is for the jury, should be adhered to, and the court should not assume to answer such question either upon a motion for nonsuit or *direction of verdict* or by substituting another answer after the verdict is returned. *Weber v. Walters* (1954), 268 Wis. 251, 67 N. W. (2d) 395.

That there can be a mutual resumption of the filial relationship and a return by the child to the status of an unemancipated minor under the law of this state, was clearly implied in the statement of Mr. Justice MARSHALL in *Grotjan v. Rice* (1905), 124 Wis. 253, 261, 102 N. W. 551, that:

"Possibly the learned court meant to be understood as saying that if appellant's parents, *in the attitude of controlling his time,* made a contract for the disposition thereof to his knowledge and with his consent, it operated as a *resumption* of parental control, if such control had been previously surrendered." (Italics supplied.)

In *Patek v. Plankinton Packing Co., supra,* at page 450, the court also recognized that an unemancipated status could be restored, when it said:

"The jury doubtless believed this frame of mind existed when the two pay checks were delivered to Alfred and continued until the trial. They probably believed that this hostility and false and unnatural pride on the part of the father made it practically impossible that the former relations [unemancipated status] should be resumed; and that Alfred was expected to provide for himself."

Plaintiffs' counsel have cited authorities to the effect that emancipation cannot be revoked. An examination of the cases presented for our consideration by the counsel clearly indicates that in the situations therein determined, the effort to rescind the emancipation was unilateral or that the rights of the minor or third persons acquired during emancipation would have been prejudiced without their consent. No authorities are cited which indicate that mutual rescission of emancipation is forbidden. We agree with the view expressed by the trial court that emancipation, like a contract or a gift, may be rescinded or nullified by the consent of the parties involved. However, since there is considerable conflict in the evidence as to whether the emancipation in the instant matter, if it existed, was rescinded, the question of rescission is one of fact. With respect to this issue, too, the determination of proper inferences to be drawn from the conflicting evidence is for the jury.

It is the rule in this state that a parent does not have a cause of action for negligence against its unemancipated minor child. *Fidelity Savings Bank v. Aulik* (1948), 252 Wis. 602, 605, 32 N. W. (2d) 613. That principle is based on the theory that it would be detrimental to the family relationship and to the wholesome influence of the home to permit such suits to be brought. In *Fidelity Savings Bank v. Aulik, supra,* this court, speaking through Mr. Justice BAR-LOW, made the following observation:

"Whether the family relationship would be strained by permitting actions of this type in view of possible coverage by insurance is in our opinion a question of public policy and not to be determined by this court. It is a question for the legislature. Members of the legislature have had an opportunity to observe the relaxation of the rule over a period of years. While the recent legislature saw fit to authorize the husband to sue his wife for like damages, ch. 164, Laws of 1947, it did not see fit to include the right of action by an

unemancipated minor son against a parent, or a parent against a minor son."

Since in the case at bar, under the evidence presented, there is likely basis for a verdict other than one in favor of the respondents-defendants with reference to the issues as to whether unemancipation continued after the daughter became eighteen years of age, or, if emancipated, whether such status was mutually rescinded, a jury must pass upon such disputed issues.

*By the Court.*—Judgment reversed, and cause remanded for a new trial upon all issues.