CARRIE BALTS v. EMERY BALTS AND ANOTHER.
MINNESOTA MINING AND MANUFACTURING COMPANY,
THIRD-PARTY DEFENDANT.

142 N. W. (2d) 66.

April 1, 1966—No. 39,709.

*Moonan & Moonan* and *Patrick W. Fitzgerald,* for appellant.
*Vennum, Newhall, Ackman & Goetz,* for respondent.

OTIS, JUSTICE.

This action is brought by a parent against a child for injuries sustained in a Wisconsin accident. The issues are: (1) The law of what state governs the question of tort immunity? (2) Will such an action lie in Minnesota?

At the time of the accident, on August 23, 1958, plaintiff, Carrie Balts, and her son, then a minor, were members of the same household domiciled in Minnesota. When action against the son was commenced in 1963, he was emancipated. Plaintiff moved to strike from the answer the defense of tort immunity, and defendant countered with a motion for summary judgment. Plaintiff's motion was granted and defendant's denied. Defendant appeals from this order, the questions determined therein having been certified by the trial court as important and doubtful.[1]

---

[1] Minn. St. 1961, § 609.09(h), now amended by L. 1965, c. 607(i), effective May 22, 1965.

■   At the outset it is conceded that in Wisconsin at the time of the accident a parent could not assert a tort claim against an unemancipated child.[2]

Minnesota has never squarely passed on the question but has assumed, without actually deciding, that the matter is governed by the law of the jurisdiction in which the tort occurs unless some overriding local policy makes the application of foreign law unacceptable to our courts. Kyle v. Kyle, 210 Minn. 204, 297 N. W. 744. Thus, we have applied various foreign guest statutes to bar recovery to parties plaintiff in Minnesota courts without apparent challenge on the part of claimants.[3]

The Restatement of Conflict of Laws, § 378, now in the process of revision, states:

"The law of the place of wrong determines whether a person has sustained a legal injury."

In a decision which has been widely cited as a departure from the Restatement rule, Schmidt v. Driscoll Hotel, Inc. 249 Minn. 376, 82 N. W. (2d) 365, we held a Minnesota dramshop proprietor liable for an injury sustained in Wisconsin. The Restatement rule was expressly rejected with the observation that since the parties were all Minnesota residents the application of Minnesota law afforded citizens of this state the protection which the statute intended they enjoy. Influenced, apparently, by the views of a number of distinguished commentators,[4] several jurisdic-

---

[2] Fidelity Sav. Bank v. Aulik, 252 Wis. 602, 32 N. W. (2d) 613; Wadoz v. United Nat. Ind. Co. 274 Wis. 383, 80 N. W. (2d) 262. See, also, Schwenkhoff v. Farmers Mutual Auto. Ins. Co. 11 Wis. (2d) 97, 104 N. W. (2d) 154.

[3] Hardgrove v. Bade, 190 Minn. 523, 252 N. W. 334; Sohm v. Sohm, 212 Minn. 316, 3 N. W. (2d) 496. See, Annotation, 95 A. L. R. (2d) 12.

[4] Cavers, *Comments on Babcock v. Jackson, A Recent Development in Conflict of Laws,* 63 Col. L. Rev. 1219, 1220 to 1223; Cavers, *The Two "Local Law" Theories,* 63 Harv. L. Rev. 822; Cavers, *A Critique of the Choice-of-Law Problem,* 47 Harv. L. Rev. 173; Cook, The Logical and Legal Bases of the Conflict of Laws, pp. 248 to 251, 345 to 346 (1942); Currie, *Comments on Babcock v. Jackson, A Recent Development in Conflict of Laws,* 63 Col. L. Rev. 1233, 1236 to 1237; Ehrenzweig, Conflict of Laws, pp. 581 to 583; Ehrenzweig, *Parental Immunity in the Conflict of*

tions have recently refused to apply the rule that capacity to sue and immunity from suit are necessarily to be determined by the law of the state where the tort occurs.

Opinions which have considered the matter have adopted the following reasoning:

(a) Stare decisis has little significance with respect to unintentional torts where the wrongdoer's conduct is not planned. There is no conscious reliance on existing rules of immunity except as they affect coverage afforded by liability insurance.

(b) By favoring the revision proposed by Restatement, Conflict of Laws, Tentative Draft No. 9, *infra,* courts move in the direction of uniformity which the Restatement is designed to achieve, thereby minimizing the likelihood of "forum shopping."

(c) The argument that the rights of the parties are vested by the law of the state of the tort is not persuasive. It is clear that if a tort has been committed a claim arises and it is only the remedy which is barred by application of the intrafamily-immunity doctrine.

What has proved to be a landmark decision is Emery v. Emery, 45 Cal. (2d) 421, 289 P. (2d) 218. There unemancipated children and their mother sought to recover damages in California against the father and an unemancipated brother for injuries resulting from an Idaho accident. The court had before it the question of what law governed intrafamily immunity — that of the state of injury, the forum state, or the domicile state. The problem was found to be one of family law rather than tort

---

*Laws: Law and Reason versus the Restatement,* 23 U. of Chi. L. Rev. 474; Ford, *Interspousal Liability for Automobile Accidents in the Conflict of Laws: Law and Reason Versus the Restatement,* 15 U. of Pittsburgh L. Rev. 397; Griswold, *Renvoi Revisited,* 51 Harv. L. Rev. 1165, 1205 to 1207; Hancock, *The Rise and Fall of Buckeye v. Buckeye, 1931–1959: Marital Immunity for Torts in Conflicts of Laws,* 29 U. of Chi. L. Rev. 237; Morris, *The Proper Law of a Tort,* 64 Harv. L. Rev. 881; Paulsen and Sovern, *"Public Policy" in the Conflict of Laws,* 56 Col. L. Rev. 969, 994; Rheinstein, *Michigan Legal Studies: A Review,* 41 Mich. L. Rev. 83. See, Annotation, 96 A. L. R. (2d) 973.

law. The place of injury was treated as fortuitous and irrelevant. The court held (45 Cal. [2d] 428, 289 P. [2d] 222):

"* * * Although tort actions between members of the same family will ordinarily be brought in the state of the family domicile, the courts of another state will in some cases be a more convenient forum, and thus the question arises whether the choice of law rule should be expressed in terms of the law of the forum or that of the domicile. We think that disabilities to sue and immunities from suit because of a family relationship are more properly determined by reference to the law of the state of the family domicile. That state has the primary responsibility for establishing and regulating the incidents of the family relationship and it is the only state in which the parties can, by participation in the legislative processes, effect a change in those incidents. Moreover, it is undesirable that the rights, duties, disabilities, and immunities conferred or imposed by the family relationship should constantly change as members of the family cross state boundaries during temporary absences from their home. Since all of the parties to the present case are apparently domiciliaries of California, we must look to the law of this state to determine whether any disabilities or immunities exist."

Other jurisdictions have followed California in applying the law of the parties' domicile to multistate tort situations. Out of these cases has emerged, explicitly or implicitly, the acceptance of Restatement, Conflict of Laws, Tentative Draft No. 9, § 390g, by courts in New Jersey, Wisconsin, New Hampshire, New York, Pennsylvania, Illinois, and Iowa.[5]

---

[5] Koplik v. C. P. Trucking Corp. 27 N. J. 1, 141 A. (2d) 34; Haumschild v. Continental Cas. Co. 7 Wis. (2d) 130, 95 N. W. (2d) 814; Wilcox v. Wilcox, 26 Wis. (2d) 617, 133 N. W. (2d) 408; Thompson v. Thompson, 105 N. H. 86, 193 A. (2d) 439, 96 A. L. R. (2d) 969; Johnson v. Johnson, 107 N. H. 30, 216 A. (2d) 781; Babcock v. Jackson, 12 N. Y. (2d) 473, 191 N. E. (2d) 279, 95 A. L. R. (2d) 1; Griffith v. United Air Lines, Inc. 416 Pa. 1, 203 A. (2d) 796; Fabricius v. Horgen, 257 Iowa 268, 278, 132 N. W. (2d) 410, 416; Wartell v. Formusa, 34 Ill. (2d) 57, 213 N. E. (2d) 544. But see, Dym v. Gordon, 16 N. Y. (2d) 120, 262 N. Y. S. (2d) 463 209 N. E. (2d) 792. Contra, Landers v. Landers, 153 Conn. 303, 216 A. (2d) 183.

We are persuaded that the proposed rule should govern our decision in this litigation. As presently drafted, it provides:

"In accordance with the rule of § 379, whether one member of a family is immune from tort liability to another member of the family is determined by the local law of the state of their domicil." [6]

Reverting to the facts of the instant case, the owner, driver, and injured passenger were all members of the same family, living together in the same household in the State of Minnesota at the time of the occurrence. It is Minnesota from which the excursion into Wisconsin originated and to which the parties were presumably to return. The vehicle was apparently registered, insured, and garaged in Minnesota. Whatever economic impact the litigation has on the parties affects a Minnesota family and a Minnesota insurer. The State of Wisconsin, on the other hand, is concerned only with enforcing its traffic laws and making its highways safe for public travel. To that end it can be argued that traffic safety in Wisconsin will be promoted rather than subverted by imposing civil liability on one who is found to be negligent in the operation of his vehicle on a Wisconsin highway.

In this day of jet planes and high-speed transportation on interstate highways, a traveler's contact with the state of the tort is ordinarily quite casual compared to the substantial and enduring interest of the domi-

---

[6] Restatement, Conflict of Laws, Tentative Draft No. 9, § 379, reads:

"(1) The local law of the state which has the most significant relationship with the occurrence and with the parties determines their rights and liabilities in tort.

"(2) Important contacts that the forum will consider in determining the state of most significant relationship include:

"(a) the place where the injury occurred,

"(b) the place where the conduct occurred,

"(c) the domicil, nationality, place of incorporation and place of business of the parties, and

"(d) the place where the relationship, if any, between the parties is centered.

"(3) In determining the relative importance of the contacts, the forum will consider the issues, the character of the tort, and the relevant purposes of the tort rules of the interested states."

ciliary state.[7] We therefore agree that this becomes a matter of family law rather than tort law and that Minnesota is free to establish its own policy of immunity without being bound by that of Wisconsin.

Courts and commentators have weighed the respective interests of the forum, the domicile, and the state of the tort by reference to where the center of gravity lies, or where the contacts are the most significant, substantial, intimate, compelling, or predominant. While we favor this approach, we recognize that the adoption of a rule which utilizes such variables results in less certainty and predictability than the long-standing rule which consistently applied the law of the state of the tort. Nevertheless, where the only question is one of intrafamily immunity, we believe uniformity and certainty can best be achieved by applying the law of the state where the parties were domiciled at the time of the event, except in those rare cases where unusual factors suggest the efficacy of applying the law of a different state.

We find support for our conclusion in a recent Pennsylvania case, McSwain v. McSwain, 420 Pa. 86, 215 A. (2d) 677. There the forum state where the parties were domiciled refused to adopt the law of the state where the tort occurred, and, in applying the rule of husband-wife immunity which prevailed in Pennsylvania, stated (420 Pa. 93, 215 A. [2d] 681):

"\* \* \* Time found the rule [of lex loci delecti] increasingly criticized as a mechanical methodology, predicated on the out-moded 'vested right' theory, and emphasizing certainty and predictability at the expense of other, frequently more relevant considerations.

\* \* \* \* \*

"\* \* \* What should be sought is an analysis of the extent to which one state rather than another has demonstrated, by reason of its policies and their connection and relevance to the matter in dispute, a priority of interest in the application of its rule of law.

\* \* \* \* \*

"Our conclusion to look to the law of Pennsylvania on the issue of

---

[7] Wisconsin has itself adopted this view in Haumschild v. Continental Cas. Co. 7 Wis. (2d) 130, 95 N. W. (2d) 814.

intramarital immunity rests, not upon a fixed and invariable rule of characterization, such as would dictate resort to the law of the marital domicile in all such cases, but upon a determination that the circumstances of the instant case do not warrant the interjection of Colorado law into what is essentially a Pennsylvania family controversy."

In arriving at our decision, we are mindful of its implications with respect to related questions which will be faced in construing and applying guest statutes affecting Minnesota residents, statutes giving rise to workmen's compensation claims in foreign jurisdictions, and the measure of damages which will govern Minnesota litigation as a result of torts inflicted elsewhere. Suffice it to say that consistent with the rationale we apply to this case, we will weigh the interests of the domiciliary state, whether Minnesota or otherwise, to the extent it is constitutionally permissible,[8] against any peculiar concern the state of the tort or the forum state may have. Such an approach will reflect all of the factors relevant to the issues rather than blindly defer to a state which may have experienced only a trivial and transitory brush with the parties to the litigation.

■ (a) *History of parent-child tort immunity.*

What meager references there are to parent-child tort immunity in early cases and commentaries deal only with the right of a child to recover for injuries against a parent and not with the converse situation. Blackstone merely observes that under English law a parent had the power to require obedience and correct his child in a reasonable manner.[9] Authorities for this conclusion are footnoted by Cooley with a statement that a parent exercises judicial authority in determining proper punishment but is liable criminally where the punishment is clearly excessive.[10] The first reported American case to which nearly all later

---

[8] Richards v. United States, 369 U. S. 1, 12, 82 S. Ct. 585, 592, 7 L. ed. (2d) 492, 500, which cites with approval Schmidt v. Driscoll Hotel, Inc. 249 Minn. 376, 82 N. W. (2d) 365, as one of the cases which "depart from the general conflicts rule in order to take into account the interests of the State having significant contact with the parties to the litigation."

[9] 1 Blackstone, Commentaries on the Laws of England, c. 16, p. 452. See Restatement, Torts (2d) §§ 147 and 150, as to what factors are to be considered in determining reasonableness of punishment.

[10] 1 Cooley, Blackstone (4 ed.) p. 399, note 2.

cases refer is Hewlett v. George, 68 Miss. 703, 9 So. 885, 13 L. R. A. 682.[11] There the Mississippi court set aside a verdict awarding damages to an unemancipated child recovered against her mother for maliciously committing the child to a mental institution. The court's decision was grounded on what it asserted to be sound public policy, the peace of society, and family repose. It concluded with an observation that criminal laws provide adequate protection against parental violence and wrong-doing. Significantly, however, no authority was anywhere cited in the opinion. Subsequent decisions in Tennessee and Washington at the turn of the century denied recovery to children who had been the victims of violent and assaultive treatment at the hands of their parents.[12] With these three cases as precedent, the doctrine of parent-child tort immunity pro-liferated in America.

If there are any common-law cases which deal squarely with family immunity, they have not come to the attention of courts and commenta-tors, either in this country or in Great Britain. However, in 1934, in a case of first impression, a British court divided five to two in approving an action by an unemancipated child against his father to recover for injuries resulting from an automobile accident. Young v. Rankin, 1934 Sess. Cas. 499. Although the court was construing the law of Scotland, the opinions focused on the common law. All agreed that as of that time there were no reported precedents regarding the right of a child to sue a parent for a tort arising out of negligence. One judge opposing immunity gave as a reason (1934 Sess. Cas. 504):

"It seems to me there is a point of real public morality, if a father, who is entitled to put the rest of the travelling public to the test of driving carefully towards him (subject to their right to say 'you contributed'), loads up his side-car (as I have seen) with two or three helpless beings, and then says to the driving public: 'You will be responsible for these two or three valuable lives and will have no recourse against my negligence.' "

Other members of the court considered the immunity issue important in the light of the unusual hazards created by modern traffic conditions. They invoked as precedents suits by children against parents for partner-

---

[11] See appendix for footnotes 11 to 22.

ship accounting, for failure to provide support, and for depleting estates. The majority rejected as analogous husband and wife immunity, pointing out that the latter was simply based on the legal fiction of *eadem persona*. The court, in commenting on the claim that such actions were contrary to public policy and social morality and would promote family "dispeace," suggested that in "extravagant" cases considerations of good sense and expediency and the "homely wisdom of juries" would discourage possible abuses of the child's right to litigate. The lack of precedent, the court said, was not because of incompetence to sue but because it may have been impolitic to do so, as where the child's maintenance might be imperiled by reducing his father to indigency. Finally, it was observed that the existence of liability insurance dispelled any concern that suits of this nature were "unnatural," the court noting that had liability insurance been available at an earlier date similar litigation would have arisen "long ago."

The dissents stressed the lack of precedent, the analogy to interspousal immunity, and the likelihood of promoting such vexatious litigation as that arising from slander, or injuries sustained "from falling out of an insecure cradle."

Young v. Rankin, *supra,* was shortly followed by Wood v. Wood, 1935 Scots L. T. R. 431, where the Lord Ordinary was confronted with the situation now before this court. A mother sued her son for injuries she sustained as a passenger in a car which her son was driving. The defendant attempted to distinguish the Young case by arguing that courts are more solicitous for the protection of children than for parents. The court was urged to adopt as a matter of public policy the rule governing husband and wife immunity. The Lord Ordinary in refusing to extend immunity held (1935 Scots L. T. R. 432):

"Now public policy has been called an unruly horse on which to ride and keep one's seat, and in recent times the law has been slow to allow any extension of the area within which public policy is allowed to operate. I can see no good ground for extending the principle from the realm of husband and wife where the parties have for long been regarded by the law as having a unique relation, to that of parent and child. It appears to

me that to do so would be acting out of harmony with the decision in *Young v. Rankin (supra)."*

No other British decisions have come to our attention.

(b) *The weight of authority.*

The great weight of authority in this country since the Hewlett case in 1891 has given effect to the parent-child tort immunity doctrine.[13] This court has adopted language verbatim from the Hewlett decision in Miller v. Pelzer, 159 Minn. 375, 377, 199 N. W. 97, 33 A. L. R. 678, citing in addition the decisions of the Tennessee and Washington courts. Subsequently, in Belleson v. Skilbeck, 185 Minn. 537, 539, 242 N. W. 1, 2, we supported immunity between a child and his parent by incorrectly invoking the common law, suggesting that any change must come from the legislature. However, as early as 1934, we approved an action by a trustee against a father for the wrongful death of a minor child in Albrecht v. Potthoff, 192 Minn. 557, 257 N. W. 377, 96 A. L. R. 471. More recently, where a child was the sole beneficiary in an action for the wrongful death of her mother against the estate of her father, we noted in Shumway v. Nelson, 259 Minn. 319, 324, 107 N. W. (2d) 531, 534:

"* * * In view of the substantial and growing modern authority repudiating the doctrine of intrafamily immunity even in direct suits, we can find no justification for overruling the Albrecht case."

Nevertheless, in so holding we continued explicitly to recognize the doctrine of parental immunity previously adopted and on which we had elaborated in London Guarantee & Accident Co. Ltd. v. Smith, 242 Minn. 211, 64 N. W. (2d) 781.

(c) *Disrupting domestic peace and tranquility.*[14]

The argument that litigation by a parent against a child promotes discord is difficult to follow. Where a wrong has been committed of a character sufficiently aggravated to justify recovery were the parties strangers, the harm has been done. We believe the prospect of reconciliation is enhanced as much by equitable reparation as by denying relief altogether, particularly where the defendant is insured.

(d) *Injuries arising out of ordinary domestic activities.*[15]

It has been suggested that lifting the defense of immunity will invite

suits for every conceivable childish wrongdoing. We believe such fears are unfounded. It is the common experience of those who have raised families that actionable torts are simply not inflicted with any frequency within the family circle, except in the operation of the family automobile. Persons living together under normal conditions in the same home are not given to stirring up serious discord for trivial matters, and parents are not likely to incur the burden of substantial legal expenses where there is no real promise of success. Nor are lawyers apt to encourage litigation which has no merit, particularly where the customary fee arrangement is a contingent one. We are not persuaded that the removal of the immunity barrier will encourage a rash of vexatious lawsuits. On the other hand, in instances where serious harm has resulted from actionable negligence or from other torts of such an aggravated nature that a member of a family would have a right to recover or would be liable if the adversary were a stranger, public policy, we believe, requires that the wrong be righted within the family group by suit or settlement.

(e) *Insurance and collusion.*[16]

We concur in the view that where a child is protected by liability insurance there is more likelihood of friction, resentment, and discord by a parent's failure to assert a claim than by instituting suit. Some jurisdictions have noted that liability insurance is designed not merely to indemnify the defendant but to protect those who are injured, more particularly if they are members of defendant's immediate family. Insurance does not create a claim where none otherwise exists. However, the presence or absence of insurance is obviously an important, if not decisive, factor in deciding whether an intrafamily action will be commenced. We see no impropriety in a suit of this kind where the carrier is the real party in interest.

Much has been written about the dichotomy between family discord and family collusion emanating from intrafamily litigation where there is liability insurance.[17] Courts and commentators who have rejected collusion as a grounds for continuing immunity have pointed to the experience of states where interspousal immunity has been abolished. Nothing has come to our attention which indicates that these jurisdictions are deluged with collusive actions or that such litigation is ridden with fraud. It is true

that some states have adopted guest statutes designed in part to prevent collusion, but we find nothing in the authorities to indicate that there is a danger of widespread perjury in jurisdictions such as ours, where passengers, who are usually on friendly terms with their drivers, are permitted to recover for ordinary negligence. While it is perhaps a human failing for drivers to favor passengers in these situations, such a tendency to color testimony is not likely to escape the attention of the jury in litigation by a parent against a child. We conclude, therefore, that the judicial system is adequate to accommodate itself to threats of collusion and that the injustice of continued immunity outweighs the danger of fraud.

(f) *Stare decisis.*[18]

For valid reasons courts are reluctant to overrule precedent lightly. It is unjust to expose to liability without notice those who have relied on existing law in conducting their affairs. Although, as we have said, the liability of a child for torts against a parent has never been squarely decided in this state, the bar has been justified in assuming we would ultimately adopt a rule consistent with that applicable to the converse situation. The retrospective application of our decision is therefore limited to the instant case only. The injustice of imposing liability on defendants who have relied on family immunity without notice of a contemplated departure from it is thus avoided. Parties who are affected will now have an opportunity to secure insurance, investigate claims, negotiate settlements, adjust rates, and, if need be, revise coverage in anticipation of a new exposure.

(g) *Makeweight arguments for immunity.*

It is urged that the impropriety of a parent's suing a child is manifested by the parent's being required to take two hopelessly inconsistent positions, one as the natural guardian of the child, and the other as a plaintiff seeking to divest the child of the very property the parent is dutybound to protect.[19] It has been further argued that where there is liability insurance the necessity for cooperation with the carrier by one member of the family in opposing the interests of another gives rise to an unseemly dilemma.[20] For reasons considered and discussed elsewhere, we are not impressed with these arguments. We are dealing with the

realities of contemporary family life in the 20th century and are not convinced that wholesale abuses will result from submitting to adjudication rights and liabilities which between a parent and his emancipated child may presently be litigated.

(h) *Parent-child litigation unrelated to torts.*[21]

At common law there was no impediment to a parent and child's suing one another to establish their property rights. There was no question about the parent's competence to bring an action on contract, or to assert his right to real or personal property, or to engage in a will contest with his children. None of the reasons assigned for invoking tort immunity seems to have created insurmountable problems in other types of litigation.

(i) *Recent trends with respect to immunity.*

Since 1957, decisions in Pennsylvania, New Jersey, New York, and Oregon have refused to abrogate family immunity although they have evoked vigorous and persuasive dissents. Parks v. Parks, 390 Pa. 287, 135 A. (2d) 65; Hastings v. Hastings, 33 N. J. 247, 163 A. (2d) 147; Badigian v. Badigian, 9 N. Y. (2d) 472, 215 N. Y. S. (2d) 35, 174 N. E. (2d) 718; Chaffin v. Chaffin, 239 Ore. 374, 397 P. (2d) 771. In 1963 Wisconsin met the parent-child immunity question head on in Goller v. White, 20 Wis. (2d) 402, 122 N. W. (2d) 193. There a child sued a foster parent for the negligent operation of a tractor on a public highway. In overruling its prior decisions upholding parental immunity, the Wisconsin court rejected the family-discord argument in the light of Wisconsin's 35-year experience in permitting tort actions between spouses. The court abrogated parental immunity in all negligence cases except where the act involved a right of parental authority or the exercise of ordinary parental discretion in providing food, clothing, housing, medical and dental services, and other care. However, the decision was given prospective application only, except as to the parties to the action.

The New Hampshire court decided the precise question here before us in Gaudreau v. Gaudreau, 106 N.H. 551, 215 A. (2d) 695, which held that an unemancipated minor was not immune from liability to his mother for injuries she suffered in an automobile accident arising out of

the son's negligence. The court there said (106 N.H. 553, 215 A. [2d] 696):

"The cases forbidding such actions rest upon the same considerations which prompt a like holding in suits by a child against a parent. It is said that they would be disruptive of family harmony, and in derogation of parental discipline and control."

The court then pointed out that unlike actions brought by children against parents there was no danger to parental discipline and control unless "such an action would breed disrespect." In refusing to grant immunity, the New Hampshire court found no statute or prior decision standing in its way and observed that its intrafamily litigation in other relationships had not proved disruptive of family unity, there was no reason to believe an action of this kind would be "any more deleterious." In concluding, the court noted that this was an area of law in which the authorities are a "conglomerate of paradoxical and irreconcilable judicial decisions," but having found no clear case for prohibiting recovery on the ground of public policy, the mother's right to sue was sustained.

(j) *Conclusion.*

We are of the opinion that experience has demonstrated no necessity for continuing the doctrine of immunity as a defense in tort actions brought by a parent against a child. Our conclusion is influenced by the increasing frequency and severity of automobile accidents and the seriousness of attendant injuries to members of the same household. The fact that in most instances the driver is covered by liability insurance minimizes the likelihood of intrafamily discord. While, of course, our decision will also affect the uninsured and will reach into family activities beyond the operation of an automobile, the prospect of vexatious or collusive litigation we believe has no substantial basis. Only where a serious wrong has been committed is it likely that children's torts will be brought to the attention of the courts. Otherwise, we are persuaded that the good judgment, restraint, and discernment of parents, lawyers, judges, and juries will act as an effective deterrent to the prosecution of fraudulent or frivolous litigation.

We are not to be understood as intimating the abrogation of tort im-

munity in actions by a child against a parent or between husband and wife. These are relationships which may well involve different and distinguishable policy considerations.[22] An adjudication involving a review of the immunity doctrine in these situations must await a full presentation in an adversary setting between litigants to whom the issue is one of genuine moment and concern, and thus justiciable.

We hold that the trial court was correct in striking the defense of family immunity from the answer and in denying defendant's motion for summary judgment. However, as to torts already committed by an unemancipated child against his parent, immunity shall continue to be given retrospective effect, except only as to the case at hand. Subject to the rules of conflicts which we now adopt, the defense of immunity is abrogated in all actions by a parent against a child arising out of torts committed from and after this date.

Affirmed.

### Appendix to Footnotes
#### Cases

1903. Footnotes 12 and 22f.
   McKelvey v. McKelvey, 111 Tenn. 388, 77 S. W. 664, 64 L. R. A. 991 (12), (22f).
1905. Footnotes 12 and 22f.
   Roller v. Roller, 37 Wash. 242, 79 P. 788, 68 A. L. R. 893 (12), (22f).
1908. Footnote 22g.
   Taubert v. Taubert, 103 Minn. 247, 114 N. W. 763: 249, 764 (22g).
1930. Footnotes 11, 15, 16, 17, 20, 22a, 22b, 22c, 22e, 22g.
   Dunlap v. Dunlap, 84 N. H. 352, 150 A. 905, 71 A. L. R. 1055: 358, 908, 1061 (11); 370, 914, 1069 (15); 367, 912, 1067 (16); 361, 909, 1063 (17); 367, 912, 1067 (20); 362, 910, 1063 (22a); 361, 909, 1063 (22b); 360, 909, 1063 (22c); 363, 910, 1064 (22e); 372, 915, 1071 (22g).

---

[22] (a) Subverting parental discipline; (b) depleting family assets; (c) inheriting child's award; (d) friction protracted by tolling of the statute of limitations; and (e) family government analogous to sovereign immunity. But see, (f) willful, intentional, or malicious torts; (g) torts arising out of a business relationship; (h) litigation following termination of the family relationship.

1930. Footnotes 11, 16, 19.
>Schneider v. Schneider, 160 Md. 18, 152 A. 498, 72 A. L. R. 449: 22, 499 (11); 23, 500 (16); 22, 499 (19).

1932. Footnote 18.
>Belleson v. Skilbeck, 185 Minn. 537, 242 N. W. 1: 540, 2 (18).

1932. Footnotes 14, 17, 22g.
>Lusk v. Lusk, 113 W. Va. 17, 166 S. E. 538 (14), (17), (22g).

1932. Footnotes 11, 21.
>Wells v. Wells (Mo. App.) 48 S. W. (2d) 109, 110 (11), (21).

1934. Footnotes 16, 17.
>Albrecht v. Potthoff, 192 Minn. 557, 257 N. W. 377, 96 A. L. R. 471: 564, 380 (16), (17).

1939. Footnotes 13, 14, 17, 18, 21, 22f.
>Rozell v. Rozell, 281 N. Y. 106, 22 N. E. (2d) 254, 123 A. L. R. 1015: 110, 256 (13); 109, 255 (14); 113, 257 (17); 112, 257 (18); 111, 256 (21), (22f).

1940. Footnote 16.
>Oliveria v. Oliveria, 305 Mass. 297, 25 N. E. (2d) 766: 299, 767 (16).

1941. Footnotes 14, 16, 18, 22a.
>Silverstein v. Kastner, 342 Pa. 207, 20 A. (2d) 205 (14), (16), (18), (22a).

1950. Footnotes 11, 13, 22f.
>Cowgill v. Boock, 189 Ore. 282, 218 P. (2d) 445, 19 A. L. R. (2d) 405: 293, 450 (11); 295, 451 (13); 296, 451 (22f).

1952. Footnotes 11, 13, 14, 16, 17, 18, 21, 22b, 22c, 22d, 22e, 22f, 22g.
>Borst v. Borst, 41 Wash. (2d) 642, 251 P. (2d) 149: 644 to 647, 150 to 151 (11), (13); 650, 153 (14); 652, 154 (16); 653, 155 (17); 657, 156 (18); 650, 153 (21); 652, 154 (22b); 655, 155 (22c), (22d); 655, 156 (22e); 647, 152 (22f); 650, 153 (22g).

1952. Footnotes 11, 16, 17, 22g.
>Signs v. Signs, 156 Ohio St. 566, 103 N. E. (2d) 743: 569 to 577, 745 to 748 (11), (16), (17); 566, 743 (22g).

1954. Footnotes 16, 21.
>London Guarantee & Acc. Co. Ltd. v. Smith, 242 Minn. 211, 64 N. W. (2d) 781: 215, 784 (16); 214, 783 (21).

1954. Footnote 22a.
>Davis v. Smith (E. D. Pa.) 126 F. Supp. 497, 504 (22a).

1954. Footnotes 11, 13.

Ball v. Ball, 73 Wyo. 29, 269 P. (2d) 302: 40, 305 (11); 41, 306 (13).

1954. Footnotes 16, 18, 22f, 22g.

Levesque v. Levesque, 99 N. H. 147, 106 A. (2d) 563: 148, 564 (16); 149, 564 (18); 148, 564 (22f); 149, 564 (22g).

1955. Footnotes 11, 14, 17, 22b, 22c, 22f.

Emery v. Emery, 45 Cal. (2d) 421, 289 P. (2d) 218: 429, 223 (11); 430, 224 (14); 431, 224 (17); 430, 224 (22b), (22c); 428, 223 (22f).

1957. Footnotes 13, 14, 16, 17, 21, 22a.

Parks v. Parks, 390 Pa. 287, 135 A. (2d) 65: 293, 69 (13), (14); 300, 73 (16), (17); 296, 70 (21); 293, 69 (22a).

1960. Footnotes 11, 15, 16, 17, 18, 21, 22a, 22b, 22f.

Hastings v. Hastings, 33 N. J. 247, 163 A. (2d) 147: 255, 152 (11); 251, 150 (15); 252, 150 (16), (17); 253, 151 (18); 259, 154 (21); 258, 153 (22a); 252, 150 (22b); 260, 155 (22f).

1960. Footnotes 11, 13.

Brennecke v. Kilpatrick (Mo.) 336 S. W. (2d) 68, 70 (11), (13).

1961. Footnotes 11, 13, 15, 16, 17, 18, 21, 22e, 22f, 22g.

Badigian v. Badigian, 9 N. Y. (2d) 472, 215 N. Y. S. (2d) 35, 174 N. E. (2d) 718: 475, 720 (11); 473, 719 (13); 480, 723 (15); 474, 719 (16); 480, 723 (17); 474, 719 (18); 476, 721 (21); 480, 724 (22e); 477, 721 (22f); 477, 722 (22g).

1962. Footnotes 14, 22h.

Logan v. Reaves, 209 Tenn. 631, 354 S. W. (2d) 789: 635, 791 (14), (22h).

1963. Footnotes 14, 15, 16, 18, 21, 22a, 22f, 22g.

Goller v. White, 20 Wis. (2d) 402, 122 N. W. (2d) 193: 409, 196 (14); 413, 198 (15); 411, 197 (16); 412, 198 (18); 410, 197 (21); 413, 198 (22a); 411, 197 (22f), (22g).

1964. Footnotes 11, 15, 22f.

Chaffin v. Chaffin, 239 Ore. 374, 397 P. (2d) 771: 379, 773 (11); 382, 775 (15); 387, 777 (22f).

1965. Footnotes 11, 16, 18, 22h.

Dean v. Smith, 106 N. H. 314, 211 A. (2d) 410: 316, 412 (11); 317, 413 (16); 317, 412 (18); 317, 413 (22h).

1965. Footnotes 11, 15, 17, 22f.

Teramano v. Teramano, 1 Ohio App. (2d) 504, 205 N. E. (2d) 586: 505, 587 (11); 509, 589 (15); 508, 589 (17); 504, 586 (22f).

**Other Authorities**

Footnote 13.

Annotation, 60 A. L. R. (2d) 1284, 1285 (13).

Footnotes 14, 17, 22a, 22b, 22e, 22f.

McCurdy, *Torts Between Persons in Domestic Relation,* 43 Harv. L. Rev. 1030, 1074 (14), 1072 (17), 1076 (22a), 1073 (22b), 1076 (22e), 1079 (22f).

Footnotes 11, 14, 16, 17, 22a, 22b, 22c, 22f, 22g.

Prosser, Torts (3 ed.) § 116: pp. 886 (11), 887 (14), 888 (16), 889 (17), 887 (22a), (22b), (22c), 888 (22f), (22g).

Footnotes 11, 22a.

Cooperrider, *Child v. Parent in Tort: A Case for the Jury?,* 43 Minn. L. Rev. 73 (11), 77 (22a).

Footnote 11.

1 Schouler, Domestic Relations (6 ed.) § 691, p. 718 (11).

ROGOSHESKE, JUSTICE (concurring specially).

While I concur in the result and greatly admire the scholarly discussion of the immunity rule by my Brother Otis, I find it difficult to justify going beyond stating the rules necessary to dispose of this case, except possibly to indicate our attitude toward the immunity rule when applied to intrafamily suits arising out of motor vehicle accidents. To announce our future intention to abolish the defense in all tort actions brought by a parent against a child in language equally critical of the defense in all intrafamily actions without being confronted with the precise issue is a most unusual procedure. It does not accord with my views of proper judicial restraint, and in my experience, such action usually creates more problems than it solves.

Moreover, I am not convinced that experience demonstrates either a necessity or desirability to judicially abolish the defense in actions arising out of ordinary domestic activities not involving the operation of a motor vehicle. It takes little imagination of those currently faced with the multitude of problems of raising a family to conceive of cases where such tort actions, especially by a child against a parent, would indeed disrupt family harmony, promote strife, breed disrespect, encourage disobedience, and subvert family peace. In the light of the public's known fear and distaste for litigating otherwise private disputes in a public courtroom, this would be a natural result in every case where a trial was neces-

sary. Far more important, however, such suits would be the vehicle by which to launch a new and divisive assault upon the family as an institution. Were the remedy made available without limitation, as some might readily anticipate from a reading of the opinion, it would insidiously invite rebellion against a parent and disobedience and disrespect from the child. This impact would be felt by families who never became aware of the rule as well as by those families where claims arose which were litigated to the bitter end. Any breach in family relations would likely be permanent where economic disaster followed the forced payment of damages awarded. Because lawyers, juries, and courts have been able to dispose of parent-child litigation unrelated to torts, it does not follow that such litigation has not visited untold miseries and discord upon the family circle.

Admittedly the "harm" is done when a tort occurs in the household. To then draw only the inference that "the prospect of reconciliation is enhanced as much by equitable reparation as by denying relief" is to overlook the more significant inference that permanent reconciliation can only be achieved by that kind of forgiveness which eliminates forever holding the family wrongdoer accountable. Experience teaches that the inestimable benefits of such forgiveness will never be experienced where it is conditioned upon the payment of money damages.

Further, there is no great weight of authority, indeed there is no American court, which has gone as far as abolishing parent-child immunity for torts apart from those arising out of the operation of a motor vehicle. This demonstrates, I believe, not a slavish adherence to precedent nor a failure to recognize a need for change, but rather that the problem is peculiarly one requiring legislative resolution. Neither judicial impatience with that process nor the fact that the defense was court-created justifies, in my opinion, such an extrajudicial prospective reversal of existing law.

SHERAN, JUSTICE (dissenting).

The effect of the majority opinion is to eliminate the doctrine of family immunity in actions for tort. Although the rule announced applies only to actions by a parent against a child, acceptance of the reasoning which supports this decision forecasts the end of immunity with respect to

actions for damages incurred by a child and caused by the negligence of a parent, and suits for tort between husband and wife as well.

I dissent from this determination because it represents a reversal, without adequate reason or compelling necessity, of long-established law based upon significant considerations of public policy.

It seems to me that before changing the rule with respect to suits of this kind, there are a number of questions, some involving social mores and others economic considerations, which should be answered, including these:

(1) Are there significant numbers among the people of this state who, apart from the exigencies of a particular case in which they may at the moment be involved, feel that the social interest is advanced by encouraging litigation between members of the same family?

(2) To what extent do people who have been injured in accidents consider themselves deprived of justice because of our rule which forbids the use of the courts to recover money damages from their children, or their parents, or their spouses?

(3) Given a choice, would people generally prefer to insure against loss occasioned by accidents of this kind through forms of insurance which provide benefits without the necessity of proving fault on the part of a family member?

(4) To what extent is it presently the practice on the part of those obtaining liability insurance to avail themselves of the advantage of lower premium rates by securing coverage which does not apply to members of the same family residing in the same household, and what will be the effect of our decision in this case upon persons who prefer that kind of coverage?

(5) To what extent will persons now immune from direct suit be exposed to claims for contribution on account of which their policies of liability insurance issued in reliance on our prior decisions afford no coverage?

(6) Will the elimination of the doctrine of family immunity lead to collusive suits and simulated adversity? Will those scrupulously forthright in the courtroom and those who prefer not to sue their close relatives be compelled through higher insurance premiums to pay the bill

for those not so restrained who may exploit the opportunities afforded by the rule now adopted?

(7) Is it good social policy to let members of the same family work out their problems between themselves? Or has the experience of our court system in dealing with sensitive domestic matters been so distinctively successful as to assure us that it is ready now to assume new responsibilities in this area?

The fact that there are no certain answers to at least some of these questions in the scholarly majority opinion proves only that this court is not equipped to provide such answers.

Determinations of fact and social policy are needed which require information and technical experience of a kind that we do not have and cannot secure. The legislature is able, through hearings before its committees, to collect the needed data, and to reflect through the votes of its members the policy change, if any, which is needed. Courts should be slow to overrule prior decisions deeply rooted in social policy. Instead we should outline the problem, giving the legislature the opportunity, in light of the delineated judicial view, to resolve it.[1] That is what was done in dealing with the problem of governmental immunity. It is a procedure which I think preferable and which could well be followed in the present situation.

If this matter had been referred, on any previous occasion, to the legislature for its attention with no action by it one way or the other, we would perhaps be justified in changing the rule of our decisions if we felt it to be clearly wrong.

I would reverse the district court upon the ground that there is in this state immunity from suit as between parent and child for torts committed by one against the other before emancipation.

---

[1] "* * * we readily concede that the flexibility of the legislative process —which is denied the judiciary—makes the latter avenue of approach more desirable." Spanel v. Mounds View School Dist. No. 621, 264 Minn. 279, 292, 118 N. W. (2d) 795, 803.