CHRISTOPHER ALLEN, A MINOR, BY ROBERT ALLEN,
HIS FATHER AND NATURAL GUARDIAN, AND
OTHERS v. JAMES GANNAWAY AND ANOTHER.

199 N. W. 2d 424.

June 30, 1972—No. 43381.

*Maun, Hazel, Green, Hayes, Simon & Aretz* and *M. C. Green,* for appellants.

*Joseph H. Rivard* and *David W. Nord,* for respondents.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order of the District Court of Washington County denying defendants' motions for summary judgment and for certain interlocutory orders, but certifying to this court that the questions presented by the motions are important and doubtful, which permits review under Rule 103.03(i), Rules of Civil Appellate Procedure. The actions have been consolidated for hearing here.

The appeal presents a single question which is decisive, namely, whether Nevada law or Minnesota law should control in the trial of the lawsuit. This question is important because Nevada has a guest statute and we have none.[1]

The facts are not seriously in dispute.[2] On March 23, 1970, five young men, all approximately 19 to 20 years of age, departed from Minnesota on a trip that was to take them across the central United States, through Denver and San Francisco, with their ultimate destination a small ranch near Spokane, Washington. The trip was never completed. On March 25, about 6:15 a.m., the automobile in which the five were riding went off a Nevada highway and rolled over. One of them, Russell Johnson, a plaintiff in this action, was thrown free of the car, was injured seri-

---

[1] See, Nev. Rev. Stat. § 41.180 (1969).

[2] There has been no trial in either case; therefore the "transcript" consists of the depositions of the five persons involved in the accident.

ously, and was hospitalized in Reno. The other plaintiff, Christopher Allen, was also injured and hospitalized in Reno. The depositions do not detail the extent to which these two were injured or whether the others suffered any injuries at all.

The automobile used for the trip was a Chevy II station wagon owned by James Gannaway, one of the five who made the trip and a codefendant in both actions. It was licensed, insured, and normally garaged in Minnesota. Robert Hobbs, the other codefendant, was driving at the time of the accident. The fifth young man, Bruce Pinke, is not a party to either action, but his deposition was taken as a witness.

The trip which ended with the accident in Nevada had sprung from Hobbs' suggestion to Pinke that they go to Spokane and help one John Boe, whom Hobbs had met in the Marine Corps, set up a ranch. Pinke communicated the idea to Gannaway, with whom Pinke attended the University of Minnesota at Morris. Pinke also recruited Johnson, a friend from high school, when they met in a restaurant in Cottage Grove. Gannaway enlisted Allen, who was an off-and-on student at Morris and lived in the same building as Gannaway. All of the participants agreed to start out from the Cottage Grove area. Gannaway left his parents' home in St. Paul Park, and picked up the others, three of them from Pinke's parents' home and Hobbs from his parents' home in St. Paul Park, sometime between 8 and 10 a. m. that Monday morning, March 23, 1970. The plan was to share the expenses and the driving among the five of them.

Each of the young men had his own thoughts about how long he would stay in Washington; each also had individual connections with Minnesota and the other states. In light of the "contacts" theory of conflicts of law, these need to be set out:

(1) James Gannaway, owner of the car and codefendant, was domiciled in Minnesota at the time the trip began, living either in Morris, at school, or with his parents. His driver's license and draft registration were in Minnesota, and he stated that he considered his parents' house his home. After the acci-

dent in Nevada he returned home. He then went to Spokane, staying about a month at John Boe's ranch, the original destination of the ill-fated trip, after which he returned to Minnesota. He had no connection whatsoever with Nevada, nor were connections with any other state brought out in the deposition.

(2) Bruce Pinke was also domiciled in Minnesota prior to the trip. He also attended school at Morris, and his parents lived in Cottage Grove, which he felt was his home prior to the trip. He stated that he left with the intention of staying in Spokane, at least for a while; and in fact after the accident he continued to San Francisco and then to Spokane. Except for short visits in Minnesota, he has remained in Washington since then; he now goes to school there and considers that his home. On April 1, 1971, he obtained a Washington driver's license, but his draft registration is still at Stillwater, Minnesota. He has no connection with the State of Nevada.

(3) Christopher Allen, one of the plaintiffs, stated that his home at the time the trip began was Needham, Massachusetts, where his parents lived at that time, although just prior to the trip he had been living in Morris, Minnesota, and West Salem, Wisconsin. He was apparently not domiciled in Minnesota. After the accident he remained in Nevada for a time, then returned to Wisconsin. Thereafter he made a short trip to Reno to visit persons he had met when he was there earlier, and then returned to Morris. When he left on the trip here involved, he had no definite plans to stay in Washington, to return to school, or to do something other than that; rather, he was waiting to see how it worked out. Allen had no apparent connections with Nevada prior to the accident but became acquainted with people while he was in Reno recovering from his injuries and waiting for Russell Johnson's release from the hospital.

(4) Robert Hobbs, the driver at the time of the accident, had been in the Marine Corps and had returned to Minnesota, where he lived either with his parents or in apartments in the Twin Cities. John Boe, whose father owned the property near Spokane,

had been a friend of Hobbs in the service. Hobbs had visited him at about Christmas time in 1969 and had returned to Minnesota with the idea of going back and setting up the ranch with Boe. When Hobbs left on the trip, he had made no specific plans as to how long he would stay in Washington, but had thought he would stay the summer or longer. As it turned out, he spent 3 weeks in Washington after the accident and then returned to Minnesota. He apparently had never established any domicile other than Minnesota. He indicated no connections with Nevada or any state other than Minnesota or Washington.

(5) Russell Johnson lived with his parents in Cottage Grove both prior to and after the trip. He looked on the trip as a short vacation, planning to return to Minnesota in about 2 weeks. He was domiciled in Minnesota and had no connections with any other state.

In a number of cases Minnesota has adopted the "center of gravity of the contacts" theory of conflicts of law. The law has been so thoroughly explored in prior decisions that we see no need of repeating here what we have already said. An examination of the following cases shows both the law we formerly followed and what we have now adopted. Phelps v. Benson, 252 Minn. 457, 90 N. W. 2d 533 (1958), applied the *lex loci delicti* theory of conflicts formerly followed by this court. Beginning with Balts v. Balts, 273 Minn. 419, 142 N. W. 2d 66 (1966), and followed in Kopp v. Rechtzigel, 273 Minn. 441, 141 N. W. 2d 526 (1966), Schneider v. Nichols, 280 Minn. 139, 158 N. W. 2d 254 (1968), and Bolgrean v. Stich, 293 Minn. 8, 196 N. W. 2d 442 (1972), we abandoned the *lex loci delicti* theory, at least where the facts bring the case within the center-of-gravity-of-the-contacts theory, which we have discussed in the later cases.

The only substantial difference between the case now before us and the others mentioned above is that one of the parties, Christopher Allen, had no definite domicile in the State of Minnesota; but apparently he had no definite domicile anywhere else either. At that time his parents lived in Massachusetts and he

spent some time in West Salem, Wisconsin; but immediately prior to the ill-fated trip he was at least a part-time student at Morris, Minnesota. Consequently, having no contacts with the State of Nevada, except that the accident happened there, he had more contacts with Minnesota than with any other state. We think the theory announced in our prior cases would bring him within the rule permitting recovery in an action brought in this state.

It might also be arguable that the facts in this case might distinguish it from any of those we have recited before since the young men involved in this excursion had no definite plans to return to Minnesota, at least not for some time. In most of the other cases involving this question, the trip usually encompassed a short drive into another state, with the intention of returning to Minnesota. Irrespective of this difference, it would seem that there are substantial contacts with Minnesota and none with Nevada. We think the rule announced in our former decisions should be followed here even though some of the parties may have intended to remain in the State of Washington for indefinite periods of time had they reached their destination without incident.

In examining the contacts which the various states involved have in this case, it is apparent that only Minnesota had more than passing interest in this action. Unlike Schneider v. Nichols, *supra,* where the accident occurred in the state of the driving defendant's residence, the mishap in the present case occurred in a state where none of the principals resided.

Defendants' main thrust is that we should return to the *lex loci delicti* theory, in which event Nevada law would apply. We decline to do so. It might be argued that Washington law should be applied because that was the intended destination. But the fact remains that the young men never arrived there, and Washington has no other connection with the incident and no other interest in the lawsuit.

We are satisfied that the trial court determined correctly that the law of Minnesota should apply.

Costs and disbursements are disallowed for failure to comply with Rule 132.01, Rules of Civil Appellate Procedure.

Affirmed.

MR. JUSTICE MURPHY took no part in the consideration or decision of this case.

MR. JUSTICE MACLAUGHLIN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.