## JAMES SILESKY, BY RALPH SILESKY, HIS FATHER AND NATURAL GUARDIAN, AND ANOTHER v. BERNICE K. KELMAN AND OTHERS.

161 N. W. (2d) 631.

September 27, 1968—No. 40,943.

*Maslon, Kaplan, Edelman, Joseph & Borman, Hyman Edelman,* and *Harvey F. Kaplan,* for appellants.

*Richards, Montgomery, Cobb & Bassford* and *Charles A. Bassford,* for respondent Silesky.

*Robins, Davis & Lyons* and *John T. Chapman,* for respondents Kelman.

NELSON, JUSTICE.

Action by Ralph Silesky, individually and as father and natural guard-

ian of his minor son, James Silesky, against Jack Kelman; Bernice K. Kelman; and Anita B. Silesky, the mother of James and the wife of Ralph Silesky.

On October 16, 1966, James was a passenger in a 1965 Buick Le Sabre automobile being driven north along Spring Valley Road in Golden Valley, Minnesota, by Anita Silesky, his mother. At the same time, defendant Bernice K. Kelman was driving a 1966 Chevrolet, owned by defendant Jack Kelman, east along St. Croix Avenue with Jack's consent and permission. The two cars collided at or near the intersection of the two roads.

Plaintiffs allege that said collision occurred as the result of the negligence of defendants Bernice and Jack Kelman, or the negligence of Anita B. Silesky, or as a result of the concurrent negligence of all of said defendants. Plaintiff James Silesky claims damages for personal injuries, and plaintiff Ralph Silesky seeks recovery for the medical expenses incurred in caring for his son.

On February 20 and February 21, 1967, complaints were served upon defendants. Subsequently, defendant Anita Silesky moved to dismiss on the ground that as the mother of plaintiff James and as the wife of plaintiff Ralph she was immune from the action for negligence. On May 9, 1967, the court granted this motion, and later the original order was amended to show that the court dismissed plaintiffs' complaint under Rules 12 and 56, Rules of Civil Procedure. They appealed from said orders. Defendant Anita Silesky was an insured person covered by a policy of liability insurance issued by the St. Paul Fire and Marine Insurance Company.

It is undisputed that prior to this court's decision in Balts v. Balts, 273 Minn. 419, 142 N. W. (2d) 66, an unemancipated child could not maintain an action in tort against his parent. See, Taubert v. Taubert, 103 Minn. 247, 114 N. W. 763; Miller v. Pelzer, 159 Minn. 375, 199 N. W. 97, 33 A. L. R. 678; Belleson v. Skilbeck, 185 Minn. 537, 242 N. W. 1. It was held in Balts, however that a parent could recover in tort from its unemancipated child, a question theretofore unsettled in Minnesota.

Plaintiffs contend on appeal that the rationale underlying the Balts decision is directly applicable to the instant case and that, in fact, the two lawsuits, parent-child and child-parent, are legally indistinguishable. Plain-

tiffs further claim that the considerations which moved this court to abolish the doctrine of "family immunity" in an action by a parent against a child apply equally to the instant case.

We are satisfied that the parental immunity doctrine has judicial origins. The history of its beginning in 1871 with the decision of Hewlett v. George, 68 Miss. 703, 9 So. 885, 13 L. R. A. 682, is fully covered in Balts v. Balts, *supra*, under its history of parent-child tort immunity.

It has been generally suggested that just as common-law principles and rules have been recognized or developed in part through judicial process, so the further adaptation and development of them must be part of the judicial power. The court may modify the common law, adopting such of its principles as are applicable and rejecting such others as are inapplicable. See, State v. Esser, 16 Wis. (2d) 567, 581, 115 N. W. (2d) 505, 512.

It was said by Mr. Justice Cardozo in The Nature of the Judicial Process, Adherence to Precedent (1921) p. 142, 150 to 152:

"* * * I am ready to concede that the rule of adherence to precedent, though it ought not to be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. We have had to do this sometimes in the field of constitutional law. Perhaps we should do so oftener in fields of private law where considerations of social utility are not so aggressive and insistent. There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years. In such circumstances, the words of Wheeler, J., in Dwy v. Connecticut Co., 89 Conn. 74, 99, [92 A. 883, L. R. A. 1915E, 800], express the tone and temper in which problems should be met: 'That court best serves the law which recognizes that the rules of law which grew up in a remote generation may, in the fullness of experience, be found to serve another generation badly,

and which discards the old rule when it finds that another rule of law represents what should be according to the established and settled judgment of society, and no considerable property rights have become vested in reliance upon the old rule. It is thus great writers upon the common law have discovered the source and method of its growth, and in its growth found its health and life. It is not and it should not be stationary. Change of this character should not be left to the legislature.' If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors."

In 11 Am. Jur., Common Law, § 2, p. 154, it is stated:

"* * * The common law is not a codification of exact or inflexible rules for human conduct, for the redress of injuries, or for protection against wrongs; on the contrary, it is the embodiment of broad and comprehensive unwritten principles, inspired by natural reason and an innate sense of justice, and adopted by common consent for the regulation and government of the affairs of men. Its development has been determined by the social needs of the community which it serves. In other words, the common law is the legal embodiment of **practical sense**. It is a comprehensive enumeration of principles sufficiently elastic to meet the social development of the people. *Its guiding star has always been the rule of right and wrong, and in this country its principles demonstrate that there is in fact, as well as in theory, a remedy for all wrongs.* The capacity of common law for growth and adaptation to new conditions is one of its most admirable features. It is constantly expanding and developing in keeping with advancing civilization and the new conditions and progress of society and adapting itself to the gradual change of trade, commerce, arts, inventions, and the needs of the country. Whenever an old rule is found unsuited to present conditions or unsound, it should be set aside and a rule declared which is in harmony with those conditions and meets the demands of justice." (Italics supplied.) Also see, 15 Am. Jur. (2d) Common Law, §§ 2 to 4.

In the decisions touching upon intrafamily immunity, it appears that the most common reasons given in support of the doctrine are that to

permit such actions would contribute to the destruction of the family by promoting strife and disrespect among the family members involved; that it may lead to fraud being practiced; and that conflicts will be promoted which will threaten domestic stability. This court in Balts waived aside these fears as unfounded when it said (273 Minn. 429, 142 N. W. [2d] 73):

"It has been suggested that lifting the defense of immunity will invite suits for every conceivable childish wrongdoing. We believe such fears are unfounded. It is the common experience of those who have raised families that actionable torts are simply not inflicted with any frequency within the family circle, except in the operation of the family automobile. Persons living together under normal conditions in the same home are not given to stirring up serious discord for trivial matters, and parents are not likely to incur the burden of substantial legal expenses where there is no real promise of success. Nor are lawyers apt to encourage litigation which has not merit, particularly where the customary fee arrangement is a contingent one. We are not persuaded that the removal of the immunity barrier will encourage a rash of vexatious lawsuits."

While it appears to be conceded that abolition of parental immunity might increase litigation between children and their parents, nevertheless such litigation is not of the type likely to threaten family peace, since the only significant source of litigation apparently feared among family members is personal injury resulting from the operation of the family automobile. It has never applied to or controlled property rights. This is so whether the plaintiff is the child or the parent. Suits are permitted among unemancipated siblings even though they remain in the family household. In Annotation, 81 A. L. R. (2d) 1155, 1157, the author states:

"Defendants in many cases involving siblings have argued that the reasoning of the courts in parent-child or husband-wife cases, namely, that to permit such actions would disrupt family harmony, encourage fraud and collusion, etc., should be applied to cases where plaintiffs and defendants are members of the same family and household, living together under the same parental authority. These arguments have been uniformly rejected."

The Connecticut court in Overlock v. Ruedemann, 147 Conn. 649, 165 A. (2d) 335, faced with precedent proscribing all tort actions between children and parents, but permitting spouses to sue, held that an unemancipated minor child could maintain an action against her unemancipated minor sister for negligence in the operation of an automobile. The court did not attempt to delineate the reasons which would permit this lawsuit while prohibiting suits between children and their parents, but stated (147 Conn. 654, 165 A. [2d] 338):

"* * * The idea that a lawsuit between members of the same family would be disruptive of family unity was created by the courts and became the basis for the common-law rule that such an action is contrary to public policy. See 1 Harper & James, op. cit. § 8.10; Prosser, op. cit., pp. 670–677. But the tendency has been to whittle away the rule by statute and by the process of interpretation, distinction and exception, until we have today a conglomerate of paradoxical and irreconcilable judicial decisions."

Signs v. Signs, 156 Ohio St. 566, 103 N. E. (2d) 743, involved an action by a minor child against his father. It was held that a parent in his business or vocational capacity is not immune from a personal tort action by his unemancipated minor child. The court stated (156 Ohio St. 575, 103 N. E. [2d] 748):

"In these modern times, with the advent of the motor vehicle and the growing complications of business and industry and where in an industrial age we are living under changed conditions, it would seem a fantastic anomaly that in a case where two minor children were negligently injured in the operation of a business, one of them, a stranger, could recover compensation for his injuries and the other one, a minor child of the owner of the business, could not.

"Ordinarily, tort actions by minor children against their parents in normal, harmonious families would be rare indeed because of the natural concern of the parents to adequately provide and care for their children, and where such actions were brought there would be a strong indication that there was no harmony or domestic felicity in the family involved to be disturbed.

"It seems absurd to say that it is legal and proper for an unemanci-

pated child to bring an action against his parent concerning the child's property rights yet to be utterly without redress with reference to injury to his person.

"It is difficult to understand by what legerdemain of reason, logic or law such a situation can exist or how it can be said that domestic harmony would be undisturbed in one case and be upset in the other."

In Balts v. Balts, *supra,* this court ruled that parent-child tort immunity would no longer be a valid defense to actions brought for torts committed from and after the date of that opinion, April 1, 1966. Mr. Justice Otis, in authoring the Balts decision, considered generally the arguments for and against the doctrine of parental immunity, the weight of authority, parent-child litigation unrelated to torts, and recent trends with respect to immunity, citing specifically the 1965 decision of the New Hampshire Supreme Court in Gaudreau v. Gaudreau, 106 N. H. 551, 215 A. (2d) 695, which held that an unemancipated minor was not immune from liability to his mother for injuries she suffered in an automobile accident arising out of the son's negligence. This court said in its consideration of the Gaudreau decision (273 Minn. 433, 142 N. W. [2d] 75):

"* * * In refusing to grant immunity, the New Hampshire court found no statute or prior decision standing in its way and observed that if intrafamily litigation in other relationships had not proved disruptive of family unity, there was no reason to believe an action of this kind would be 'any more deleterious.' In concluding, the court noted that this was an area of law in which the authorities are a 'conglomerate of paradoxical and irreconcilable judicial decisions,' but having found no clear case for prohibiting recovery on the ground of public policy, the mother's right to sue was sustained."

In Goller v. White, 20 Wis. (2d) 402, 122 N. W. (2d) 193, the Wisconsin Supreme Court abrogated the parental-immunity rule in negligence actions. That court indicated its doubt that permitting a child to sue his parent for negligence would have any disruptive effect upon family harmony. Referring to the fact that at common law suits are maintainable between child and parent concerning property and contract rights, it pointed out that some of the most acrimonious family disputes arise with

respect to property and that therefore it is difficult to argue that the law should protect the property rights of a minor more zealously than the rights of his person.

Certainly, no shadow of difference in principle or policy has been shown to exist between the two situations—a personal injury action by parent against child and a personal injury action by child against parent. The hostility of the courts to the parental-immunity rule in negligence cases is shown by the exceptions that have been carved out of it. For instance, the rule has been held not to apply to a suit brought by the child against the personal representative of a deceased person. An exception has also been recognized by some courts where the parent's tort constitutes willful misconduct.

The courts of Ohio and Washington have held that the parental-immunity rule does not apply if the parent was engaged in his business or occupation at the time he committed the negligent act. Signs v. Signs, *supra*; Borst v. Borst, 41 Wash. (2d) 642, 251 P. (2d) 149. 1 Harper and James, Law of Torts, § 8.11, p. 650, advocates allowing the maintenance of an action in tort against a parent or a child in every case "in which it is reasonably clear that the domestic peace has already been disturbed beyond repair or where by reason of the circumstances it is not imperiled, and where the reasonableness of family discipline is not involved." The authors also point out that one situation in which family harmony is not thereby disturbed arises where there is liability insurance coverage. Some courts have grounded recovery by a minor child against a parent upon the existence of insurance. See, Worrell v. Worrell, 174 Va. 11, 4 S. E. (2d) 343, and Lusk v. Lusk, 113 W. Va. 17, 166 S. E. 538. See, also, Dunlap v. Dunlap, 84 N. H. 352, 150 A. 905, 71 A. L. R. 1055.

Our decision in the Balts case considered the wide prevalence of liability insurance in personal injury actions a proper element to be considered in making the policy decision of whether to abrogate parental immunity in negligence actions. The court in Goller v. White, *supra,* said that this is so because in a great majority of such actions, where such immunity has been abolished, the existence of insurance tends to negate any

possible disruption of family harmony and discipline. The Wisconsin court in Goller concluded in its opinion abrogating the parental-immunity rule that there were compelling reasons for making this change in existing law prospective only and that therefore the rule announced abrogating parental immunity was limited to causes of actions arising on or after June 28, 1963, the date of the filing of the opinion, with the exception that it was made applicable to the case before the court.

The question facing this court is the exact converse of the issue before the Wisconsin Supreme Court in Ertl v. Ertl, 30 Wis. (2d) 372, 141 N. W. (2d) 208. In the Ertl case, the Wisconsin court, having already abolished the immunity of the parent in an action by a child in Goller v. White, *supra*, had been asked to extend its holding to an action by the parent against a child. While the plaintiff in Ertl did not prevail because her cause of action arose prior to the Goller decision, the court nevertheless made it clear that the controlling policies underlying the two lawsuits were the same, stating (30 Wis. [2d] 374, 141 N. W. [2d] 209):

"In *Goller* we reviewed and rejected the family-discord policy ground for the immunity of the parent and decided to abrogate the immunity. The policy ground which is the foundation for both immunities having been rejected, and this court having so clearly, in *Aulik*, [252 Wis. 602, 32 N. W. (2d) 613] treated the child's immunity as a corollary of the parent's immunity, we conclude that the abrogation of the child's immunity necessarily flowed from *Goller*."

The Wisconsin Supreme Court in the Goller case abolished the parental-immunity rule in personal injury actions except in two situations: (1) Where the alleged negligent act involves an exercise of parental authority over the child; and (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to provisions of food, clothing, housing, medical and dental services, and other care. We think the foregoing exceptions articulate two situations in which parental immunity might well remain in force.

As to reliance upon interspousal immunity, see decisions in Cramer v. Cramer (Alaska) 379 P. (2d) 95, and Briere v. Briere, 107 N. H. 432,

224 A. (2d) 588,[1] these cases disposing of any claim basis for the parental-immunity rule. Under the common law the status of an unemancipated minor with relation to his parent is clearly distinguishable from that of the husband-wife relationship. Concerning the depletion of the family exchequer rationale, the New Hampshire court in Briere made the following apposite comments (107 N. H. 435, 224 A. [2d] 590):

"As to the depletion of the family exchequer, the court in [Dunlap v. Dunlap, 84 N. H. 352, 150 A. 905] summarily rejected this argument as having no substantial weight and said that it ignored 'the parent's power to distribute favors as he will, and leaves out of the picture the depletion of the child's assets of health and strength through the injury.' *Id.*, [84 N. H. 361, 150 A. 909]. To this may be added today's reality that if the father has means, he will almost inevitably carry insurance, and if he has not, the chances of anyone bringing suit for the child are remote. See *Dean v. Smith,* 106 N. H. 314, 317-318. We agree that the existence of insurance should not impose a duty upon a parent where none existed before. *Dean v. Smith, supra.* However, as a practical matter, the prevalence of insurance cannot be ignored in determining whether a court should continue to discriminate against a class of individuals by depriving them of a right enjoyed by all other individuals. *Dunlap v. Dunlap, supra;* *Dean v. Smith, supra.*"

New Hampshire became the second jurisdiction to abolish the doctrine of parental immunity in regard to ordinary negligence actions. In the Briere case the court said the following in regard to the domestic tranquility argument (107 N. H. 436, 224 A. [2d] 591):

"* * * We further believe that family peace and parental authority, in the overwhelming majority of cases, will be threatened less by an unemancipated minor's suit for tort against a parent, where the latter is generally protected from loss by insurance, than by an action for breach of contract or to enforce property rights where the parent would ordinarily have to pay a verdict from his own pocket. See Prosser on Torts, *s.*

---

[1] Also see, Self v. Self, 58 Cal. (2d) 683, 26 Cal. Rptr. 97, 376 P. (2d) 65; Klein v. Klein, 58 Cal. (2d) 692, 26 Cal. Rptr. 102, 376 P. (2d) 70.

101, *pp.* 677-678 (1955); 1 Harper & James, The Law of Torts, *s.* 8.11, *pp.* 649-650 (1956); II Harper & James, The Law of Torts, *s.* 13.4, *p.* 767 (1956)."

In regard to the fraud-collusion-perjury argument, we are of the opinion that it does not warrant denial of a remedy to the child. Balts v. Balts, *supra*; Hebel v. Hebel (Alaska) 435 P. (2d) 8; Cramer v. Cramer, *supra*. The Alaska court in the Hebel case quotes the following from Mr. Justice Fuld's dissent in Badigian v. Badigian, 9 N. Y. (2d) 472, 481, 215 N. Y. S. (2d) 35, 43, 174 N. E. (2d) 718, 724:

"The problem, in short, comes to this: A child is seriously injured by his father's careless operation or maintenance of his automobile. As the law now stands, the judgment recovered against the parent is more than likely, in the vast majority of cases, to be paid by an insurer. If the crippled child may have the benefit of this insurance, a fund will be supplied the family to provide for him. If the fund is cut off, cripple as well as parent will have to stagger beneath the load. To tell them that the pains must be endured for the peace and welfare of the family is something of a mockery."

On the balance we believe that the scales should be weighed in favor of affording the injured child a remedy in the instant case, subject to certain exceptions in accordance with the holding of the Wisconsin court in Goller v. White, *supra*. The traditional explanations which have been proffered in favor of parental immunity become less and less persuasive. As we see it, neither individually nor collectively do the arguments in support of the immunity rule outweigh the necessity of according the child a remedy for wrongful negligent injury to his person. This factor of negligent wrong is and must be of paramount significance. As was said in Hebel v. Hebel (435 P. [2d] 15):

"* * * It appears to us illogical to sanction property actions between unemancipated minors and their children; to allow an action if the child happens to be emancipated; to permit an action if the parent inflicts intentional harm upon the child; or if that harm is inflicted through negligence characterized as gross or wanton; to permit an action should the

child happen to be injured in the course of the parent's business or vocation; to permit an action if the parent is deceased; but, on the other hand, to deny the unemancipated child redress for his personal injuries when caused by the negligence of a living parent."

While the existence of liability insurance does not create liability, its presence is of considerable significance in the case at bar. To persist in adherence to family harmony and parental discipline and control arguments when there is automobile liability insurance involved is in our view unrealistic. As stated in Hebel, "If there is insurance there is small possibility that parental discipline will be undermined, or that the peace of the family will be shattered by allowance of the action." 435 P. (2d) 15.

After a careful review of the briefs and arguments for and against the parental-immunity rule in negligence cases as applied to child versus parent, we are of the opinion that the rule ought to be abrogated, except in the following situations: (1) Where the alleged negligent act involves an exercise of reasonable parental authority over the child; and (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care, as similarly adopted by the Wisconsin court in Goller v. White, *supra.*

Thus, as against defendants, plaintiffs' complaint states a cause of action, subject to the interspousal-immunity rule as it may affect Ralph Silesky's claim for his son's medical, surgical, dental, and nursing care incurred by reason of the necessary healing treatment resulting from the accident. Accordingly, the dismissal of the action is reversed and plaintiffs' pleadings reinstated.

In Balts v. Balts, *supra,* we resolved that a parent may maintain an action for personal injuries caused by an unemancipated minor's negligence. But in that action this court said (273 Minn. 433, 142 N. W. [2d] 75):

"We are not to be understood as intimating the abrogation of tort immunity in actions by a child against a parent or between husband and wife. These are relationships which may well involve different and distinguishable policy considerations. An adjudication involving a review of

the immunity doctrine in these situations must await a full presentation in an adversary setting between litigants to whom the issue is one of genuine moment and concern, and thus justiciable."

We have the latter situation involving child and parent in the adversary setting before us. However, as we do not have a full presentation in an adversary setting between litigants on the question of interspousal immunity, we refrain from entering any decision on that issue at this time. The change in the rule of child-parent immunity announced herein is prospective only and is limited to causes of action arising on or after the date of the filing of this opinion, except that it is to be applicable to the instant case.

Reversed and remanded.

PETERSON, JUSTICE (concurring specially).

I concur because the policy of abrogating family immunity was decided in Balts v. Balts, 273 Minn. 419, 142 N. W. (2d) 66. I am unable to distinguish an action by a child against a parent from one by a parent against a child.

ROGOSHESKE, JUSTICE (dissenting).

I dissent. As in Balts, the reasons stated for the rule announced arguably support the complete abrogation of the immunity rule in all actions for personal injury resulting from ordinary negligence between members of a family living in the same household. As expressed in my disagreement with the Balts opinion, I cannot agree with a holding which I fear will create innumerable legal and social problems and which I believe amounts to an unwarranted intrusion into the family circle.

It may be that the arguments advanced for the removal of the immunity defense in a parent-child action are "legally indistinguishable" from an action by a child against a parent, but the social and legal relationship of a child to its parents presents a far more difficult problem of weighing competing public policies which, as emphasized by the dissent in Balts, the legislature is best equipped to consider and attempt to resolve. In addition to those "different and distinguishable policy considerations" enumerated in Balts,[1] parents may be assumed capable and ex-

---

[1] "(a) Subverting parental discipline; (b) depleting family assets; (c)

pected to exercise discernment and good judgment before suing their child. Also, a child injured by the negligence of a parent is not without a remedy since the parent is not only instinctively but morally and legally bound to provide adequate care and support.

To use the family automobile accident as a basis for permitting a young, immature child to litigate the claimed fault of a parent in open court under our adversary system in all but the most vague and still to be defined domestic activities is to use a "hatchet instead of a scalpel" to afford a remedy to a child disabled by the negligent operation of the family automobile. While modern day realities may justify abolishing family immunity in tort actions arising out of the operation of a fully insured automobile, the majority opinions of Balts and this case reach far beyond the judicial action necessary to afford relief to the injured child. All that would be required is to eliminate the defense in such cases, coupling with it the permissive joinder of the insurance carrier as a party defendant. Such would be consistent with the language and spirit of our rules of procedure,[2] would minimize the impact of the change upon the family unit, and would make clear that it is the development of liability insurance coverage that is the decisive reason for overruling our prior decisions. This, together with the comprehensive treatment of the entire problem in Balts and this case, would alert the legislature to the growing judicial dissatisfaction with court-created rules of immunity and invite its attention to the end that such legislation would be enacted as would reflect the public's need and desire for change.

SHERAN, JUSTICE (dissenting).

I do not believe that any public or private interest is served by encouraging litigation between parents and their children. For the reasons given in the dissenting opinion in the Balts case, I would not make further inroads on this immunity.

---

inheriting child's award; (d) friction protracted by tolling of the statute of limitations; and (e) family government analogous to sovereign immunity." Balts v. Balts, 273 Minn. 419, 434, 142 N. W. (2d) 66, 75.

[2] Rules 18.02 and 20.01, Rules of Civil Procedure; Wright, Minnesota Rules, pp. 116 to 118.