Breeanna Lynn ANDERSON, a minor, by her father and natural guardian, Edward F. Anderson and Edward F. Anderson, Individually, Plaintiff,

v.

Edna STREAM and Martin Stream, defendants and third party plaintiffs, Appellants,

v.

Edward F. ANDERSON and Mrs. Edward F. Anderson, third party defendants, Respondents.

Michael NUESSLE, a Minor, by Loretta Nuessle, His Guardian Ad Litem, Appellant,

v.

James NUESSLE, Respondent.

Nos. 49520, 50644.

Supreme Court of Minnesota.

July 3, 1980.

Rehearings Denied Sept. 8, 1980.

Cousineau, McGuire, Shaughnessy & Anderson and Barbara A. Burke, Minneapolis, for Stream.

Murnane, Murnane, Conlin & White and Steven J. Kirsch, St. Paul, for James L. Nuessle.

Reding & Votel and James A. Reding, St. Paul, for Anderson.

Dorfman, Goff & Hauge and Donald E. Holly, Minneapolis, for Michael Nuessle.

Heard before YETKA, SCOTT, and WAHL, and considered and decided by the court en banc (*Anderson v. Stream v. Anderson*, Case No. 49520); considered and decided by the court en banc without oral argument (*Nuessle v. Nuessle*, Case No. 50644).

SCOTT, Justice.

These two appeals raise similar issues regarding the exceptions to the abrogation of parental immunity as adopted by this court in *Silesky v. Kelman*, 281 Minn. 431, 161 N.W.2d 631 (1968). In both cases, the trial courts concluded that the exceptions were applicable and thus held that the injured children had no actionable claim against their respective parent(s). We reverse.

The operative facts of these appeals have been stipulated to by the respective parties:

*Anderson v. Stream v. Anderson*

Edward and Ruth Anderson are the parents of Breeanna Anderson, who was born on June 16, 1975. Defendants Edna and Martin Stream live in a house next door to the Anderson home, and the two families share a common driveway. The line dividing the two properties runs generally down the center of the driveway. There is no fence between the two houses.

On Sunday morning, May 15, 1977, Breeanna, who was approximately 23 months of age, asked her parents if she could go outside and play. Breeanna was allowed to do so, but was told to "stay in the back." While Breeanna played outdoors, Mr. Anderson read the Sunday newspaper and Mrs. Anderson did housework. About 10 or 15 minutes after she began to play, Breeanna was injured when Edna Stream backed her automobile over the child's leg. After the accident occurred, Breeanna was found sitting partially on the Streams' lawn and partially on the portion of the driveway located closest to the Stream home.

Neither Mr. nor Mrs. Anderson saw the accident. However, during the 10–15 minute period Breeanna was playing, Mrs. Anderson saw her daughter twice; once, when Breeanna was playing by the back step, and later, when she was playing in the front yard of the Anderson home. Also, the parties agree that the Andersons had observed Breeanna playing on or about the common driveway on several occasions prior to May 15, 1977.

Edward Anderson, as guardian for his minor daughter, and in an individual capacity, brought an action against the Streams for the damages which resulted from the child's injuries. The Streams later impleaded Mr. Anderson and his wife for contribution and indemnity. Thereafter, the Andersons moved for summary judgment against the Streams on the third-party complaint, claiming no common liability existed because they could not be held liable to their child. The district court granted the motion and dismissed the third-party complaint on the ground that parental im-

munity was applicable. The Streams now appeal from the judgment entered in the district court.[1]

### Nuessle v. Nuessle

On the afternoon of October 4, 1975, Michael Nuessle, who was about 3 years old at the time, accompanied his father, James Nuessle, on an errand to a drugstore located on the northwest corner of the intersection of Victoria Street and Grand Avenue in St. Paul. Defendant entered the drugstore, and after 10 to 15 seconds noticed that his son was not with him. It is unclear whether Michael actually entered the store. After looking briefly in the store for his son, defendant, through the glass door of the store, saw Michael crossing Grand Avenue. Michael was walking alongside an adult male, whom the child may have mistaken for his father. Defendant hurried outside, and without looking for traffic and in an act which defendant described as one of "panic," yelled Michael's nickname, "Micker." The child turned around, saw his father, and took a few steps to the north, recrossing the center line of Grand Avenue, while remaining in the crosswalk. Michael was then struck by the left front part of an automobile driven by a westbound driver who did not see the boy before hitting him. The child sustained serious injuries, including damage to his brain stem.

This action was commenced to recover damages against James Nuessle for Michael's injuries. Defendant subsequently moved for summary judgment on the ground that in this case the parental immunity doctrine operated to bar his son's claim. The trial court agreed, ruling that the first exception to the abolishment of parental immunity was applicable. Plaintiff now seeks review of the district court's decision.

The parties raise a number of issues in these appeals, including: whether the parents' conduct constitutes an "affirmative act of negligence" as recognized by this court in Romanik v. Toro Co., 277 N.W.2d 515 (Minn.1979);[2] whether the parents' alleged wrongdoing involves parental supervision; whether parental supervision qualifies as an exercise of "parental authority" under the first Silesky exception, and, if so, whether the conduct in question is "reasonable" within the meaning of Silesky; and, solely in regard to the Anderson appeal, whether the parents' alleged negligent act involves an exercise of "parental discretion with respect to the provision * * * of housing" as contemplated by the second Silesky exception, and, if so, whether that exercise of parental discretion is "ordinary." An additional issue presented, and the one we find decisive in these cases, is whether the Silesky exceptions to the abrogation of parental immunity should be retained. After a careful and painstaking examination of this difficult and important question, we conclude, for the reasons discussed herein, that the exceptions should no longer be followed in this state.

The Silesky decision, rendered in 1968, abrogated the long-standing doctrine of parental immunity subject to the following exceptions: "(1) where the alleged negligent act involves an exercise of *reasonable parental authority* over the child; and (2) where the alleged negligent act involves an exercise of *ordinary parental discretion* with respect to the provision of food, clothing, housing, medical and dental services, and other care * * *." 281 Minn. 442, 161 N.W.2d 638 (emphasis added). These exceptions were expressly adopted from the Wisconsin Supreme Court's decision in *Gol-*

---

1. We note that although the trial judge ordered judgment in favor of the Streams, he did not, in accordance with Minn.R.Civ. P. 54.02, state that "there is no just reason for delay" for the entry of judgment. Consequently, since the judgment does not adjudicate all claims and rights of all parties, it is nonappealable. *Financial Relations Board, Inc. v. Pawnee Corp.*, 308 Minn. 109, 240 N.W.2d 565 (1976); *Buchman Plumbing Co. v. Regents of Univ. of Minn.*, 298

Minn. 328, 196 N.W.2d 629 (1972); *Shryock v. Mitchell Concrete Products*, 87 S.D. 566, 212 N.W.2d 498 (1973). However, due to the importance of the issues raised by this case, we hereby grant discretionary review as provided for in Minn.R.Civ.App. P. 105.

2. The *Romanik* decision is discussed in 6 William Mitchell L.Rev. 219 (1980).

*ler v. White*, 20 Wis.2d 404, 122 N.W.2d 193 (1963). The language used in *Silesky* is identical to that set out in *Goller* except for the addition by this court of the term "reasonable" to modify the phrase "parental authority," in the first exception.

While the *Silesky* court was well-intentioned in continuing the immunity doctrine in regard to certain parental conduct, application of the exceptions has proven to be very difficult because their precise scope is by no means clear. *Compare, e. g., Thoreson v. Milwaukee & Suburban Transport Co.*, 56 Wis.2d 231, 201 N.W.2d 745 (1972), *with Paige v. Bing Const. Co.*, 61 Mich.App. 480, 233 N.W.2d 46 (1975) (in construing the "parental authority" exception with respect to parental supervision, the Wisconsin and Michigan courts reached different results). The prospect of applying these vaguely worded, highly subjective standards to the ever-increasing number of parent-child liability cases coming before this court[3] is reason to reflect upon the degree of difficulty in meaningful interpretation of the exceptions and alternative means of providing parents with some leeway in exercising their parental authority and discretion. We believe that since the problems inherent in construing the *Silesky* exceptions present a real danger of arbitrary line-drawing and in light of the fact that instructing the jury on a "reasonable parent" standard adequately protects functions which are parental in nature, the continued existence of the *Silesky* exceptions cannot be justified.

As noted *supra*, were we to apply the *Silesky* exceptions many troublesome questions would be encountered. Perhaps the best example of the perplexing and frustrating problems associated therewith is the interpretation of the terms "reasonable" and "ordinary" as they are used in the first and second exceptions, respectively. For example, on the surface it would appear that the first exception does not preclude liability in the event the parent acted "unreasonably" in exercising his parental authority. However, such a construction would be co-extensive with the conclusion that the parent was negligent. Accordingly, a literal interpretation of the modifier "reasonable" would mean that a parent is immune from liability only in situations where he is non-negligent in exercising his parental authority. This result was surely not intended by the *Silesky* court, as it would provide no real immunity and thus makes a sham of the first exception. Construction of the term "ordinary" in the second exception presents a similar problem.

Consequently, it is suggested by some that the terms "reasonable" and "ordinary" be interpreted to exclude "outrageous" acts of parental authority or discretion from the scope of the *Silesky* exceptions. Although this proposed interpretation would give some vitality to the exceptions, it is admittedly highly subjective and would require a case-by-case analysis by a court of whether the "outrageous" test was met. As such, this standard is not very helpful, and certainly adds to the potential for arbitrary decision-making in the area.

Difficulty in application would not, in and of itself, cause us to cast aside the *Silesky* exceptions. The determinative consideration upon which we rest our decision is that the areas of parental authority and discretion, for which the *Silesky* exceptions were designed to provide safeguards, can be effectively protected by use of a "reasonable parent" standard, as adopted by the court in *Gibson v. Gibson*, 3 Cal.3d 914, 92 Cal. Rptr. 288, 479 P.2d 648 (1971). In that case, the California Supreme Court completely abolished the doctrine of parental immunity. While recognizing that "traditional concepts of negligence cannot be blindly applied to" acts involving parental authority and discretion, the court refused to adopt the *Goller* exceptions by reasoning, in part, that "[t]he *Goller* view will inevitably result in the drawing of arbitrary distinctions

---

**3.** Including the instant appeals, at least four cases presently before this court raise issues relating to the application of the *Silesky* exceptions. The other appeals are: *Berman v. Sun-* *beam Corp.*, Case No. 49610 and *Graham v. Minneapolis, Northfield and Southern Railway*, Case No. 50764.

about when particular parental conduct falls within or without the immunity guidelines." 3 Cal.3d 921, 92 Cal.Rptr. 293, 479 P.2d 653. Instead, the *Gibson* opinion held that the better approach is to have the jury take into consideration the parental function when determining whether the parent acted negligently. As stated by the *Gibson* court:

> The standard to be applied is the traditional one of reasonableness, but viewed in light of the parental role. Thus, we think the proper test of a parent's conduct is this: What would an ordinarily reasonable and prudent *parent* have done in similar circumstances?

3 Cal.2d 921, 92 Cal.Rptr. 293, 479 P.2d 653 (emphasis in original).

The *Gibson* decision is supported by Judge Fuchsberg's incisive concurring opinion in *Nolechek v. Gesuale*, 46 N.Y.2d 332, 413 N.Y.S.2d 340, 385 N.E.2d 1268 (1978), where it is advocated that "each parent-child case * * * be decided by answering the broad question at the heart of negligence law: What would an ordinarily reasonable and prudent person—taking into account the parent-child relationship—have done in similar circumstances?" 46 N.Y.2d 346, 413 N.Y.S.2d 349, 385 N.E.2d 1277. Judge Fuchsberg continues:

> A standard of "reasonable care under the circumstances," well understood in tort law * * *, would not require that a parent live up to some idealized picture of a model father or mother. A mere misjudgment in supervising one's child would not necessarily constitute a tortious breach of duty. In determining whether the bounds of reasonable behavior have been transgressed, all of the relevant facts and circumstances would have to be considered. In a supervision situation, among the foremost are bound to be the existence of the relation of parent and child; the practical responsibilities, expectations and limitations that flow therefrom; and the judgmental nature of the decisions a parent must make in functioning in that capacity.

Without developing this point *in extenso*, the weight which a court or jury will ascribe to each of these and other related factors will depend on the facts peculiar to the particular case. For example, aside from the facts relating to the negligence itself, such variable matters as the age, mental and physical health, intelligence, aptitudes and needs of the child involved; the presence in the family of other children competing for parental time and attention; and the economic, social and physical environment in which the parental conduct occurs, all may be expected to play a part.

It is hard to see why such a tailoring of the results of each case to its facts is not to be preferred to the erection of rigid classifications, be they catalogued as "trespasser," "licensee" or "business visitor," as "grossly" or "ordinarily" negligent or as "supervising parent." Looking to the entire picture, rather than merely the labels, is the surer path to a just result.

46 N.Y.2d 346, 413 N.Y.S.2d 349, 385 N.E.2d 1277 (citations omitted). We also note that several commentators have endorsed the *Gibson* decision as being superior to the *Goller* view. Note, *Intrafamilial Tort Immunity in New Jersey: Dismantling the Barrier to Personal Injury Litigation*, 10 Rut.-Cam.L.J. 661, 679 (1979); Note, *The "Reasonable Parent" Standard: An Alternative to Parent-Child Tort Immunity*, 47 U.Col.L.Rev. 795, 808 (1976); Note, *The Parent-Child Tort Immunity Law in Massachusetts*, 12 New Eng.L.Rev. 309, 331 (1976); Comment, *Parental Immunity: The Case for Abrogation of Parental Immunity in Florida*, 25 U.Fla.L.Rev. 794, 801 (1973); Comment, *Parental Immunity: California's Answer*, 8 Idaho L.Rev. 179, 187 (1971).

▪ Like the above authorities, our preference for the *Gibson* approach recognizes the practical advantages offered by utilization of a "reasonable parent" standard. It attains the *Silesky* goal of according parents some flexibility in their exercise of parental functions, but the interpretive pitfalls associated with the *Silesky* exceptions are avoided. In reaching this conclusion,

we reject the contention that juries are incapable of rationally and equitably deciding whether a parent has acted negligently in exercising his parental control and discretion. Our system of justice places great faith in juries, and we see no compelling reason to distrust their effectiveness in the parent-child context. Nor do the arguments relating to family discord and collusion require a different result than that reached herein. These claims, which were found to be unpersuasive in the initial decision abrogating intrafamilial immunity, *see Balts v. Balts*, 273 Minn. 419, 142 N.W.2d 66 (1966)[4] (involving a child's liability to his parents), are no more convincing today.[5]

It should also be observed that our decision to abolish the *Silesky* exceptions in favor of a "reasonable parent" standard is supported by basic principles of public policy. A fundamental concept of our legal system and a right guaranteed by our state constitution, is that a remedy be afforded to those who have been injured due to the conduct of another. *See, Nieting v. Blondell*, 306 Minn. 122, 235 N.W.2d 597 (1975);

Minn.Const. art. I, § 8.[6] Related thereto is the equitable doctrine of contribution, which requires that those who contribute to an injury bear liability in direct proportion to their relative culpability. *See, e. g., Tolbert v. Gerber Industries*, 255 N.W.2d 362 (Minn.1977). These considerations are promoted by today's holding.

Finally, the prevalence of liability insurance is a pertinent and important factor in subjecting parents to suit by their children. *Balts, supra; Silesky, supra.* After all, our paramount objective is to compensate the child for his or her injuries, and the widespread existence of homeowner's and renter's liability insurance[7] will help effectuate this goal. To deny the injured child this source of funds on the ground that prosecution of the claim would in some way disrupt the family unit is an anomaly this court will not tolerate. Similar sentiments were expressed in the *Balts, supra,* opinion: "[W]here a child is protected by liability insurance there is more likelihood of friction, resentment, and discord by a parent's failure to assert a claim than by instituting

4. In regard to the family disruption contention, the *Balts* decision reasoned that:
 The argument that litigation by a parent against a child promotes discord is difficult to follow. Where a wrong has been committed of a character sufficiently aggravated to justify recovery were the parties strangers, the harm has been done. We believe the prospect of reconciliation is enhanced as much by equitable reparation as by denying relief altogether, particularly where the defendant is insured.
 273 Minn. 429, 142 N.W.2d 73; *see, also,* discussion of liability insurance, text, *infra.* With respect to collusion, the *Balts* court stated that a jury is capable of seeing through "colored testimony" and consequently our "judicial system is adequate to accommodate itself to threats of collusion * * *." 273 Minn. 431, 142 N.W.2d 73.

5. We are similarly unpersuaded by the contention that abolishment of the exceptions is unwise because the concept of impleader, *see* Minn.R.Civ. P. 14, may operate to force parents to *involuntarily* have their alleged negligence aired before a jury. Even assuming that the parent was immune from liability, his or her negligence would still be litigated and submitted to the jury for a comparative fault determination, notwithstanding a parent's desire to keep the matter private. *See, Lines v. Ryan,*

272 N.W.2d 896 (Minn.1978). Thus, our decision to abolish the exceptions does not affect the extent to which a parent's alleged misconduct may be involuntarily submitted for a jury's consideration.

6. That constitutional provision declares:
 Redress of injuries or wrongs. Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws.

7. The argument is made that heavy reliance cannot be placed on homeowner's and renter's liability insurance because it is not required by statute, as is motor vehicle insurance. This assertion ignores the fact that at the time the *Silesky* case was decided, automobile insurance coverage was not compulsory, but yet the *Silesky* court found such insurance to be a compelling consideration. Similarly, although homeowner's and renter's liability insurance is not statutorily mandated, such coverage, which is unquestionably quite common, is a proper and persuasive factor to be relied upon in reaching our decision.

suit." 273 Minn. 430, 142 N.W.2d 73. *See, also, Baudette v. Frana*, 285 Minn. 366, 173 N.W.2d 416 (1969).[8]

 In summary, by this decision we totally abolish the doctrine of parental immunity[9] and consequently overrule *Silesky* to the extent it retained parental immunity in the form of the aforementioned exceptions. In so doing, we adopt the approach of the California Supreme Court in *Gibson, supra*, of charging the jury on a "reasonable parent" standard.

Reversed and remanded for trial.

ROGOSHESKE, Justice (dissenting).

I disagree with the majority's complete abrogation of parent-child tort immunity in negligence cases. I am not persuaded that the parent-child relationship, long preserved from legal interference on public policy grounds, has so declined in importance that considerations of insurance and simplified judicial administration under a jury standard warrant application of general tort principles to family interactions. In my view, the *Silesky*[1] exceptions to abrogation of parental immunity should be retained and, on these facts, the first exception should be applied to immunize negligent parental supervision.

In *Balts v. Balts*, 273 Minn. 419, 142 N.W.2d 66 (1966), and *Silesky v. Kelman*, 281 Minn. 431, 161 N.W.2d 631 (1968), we considered the policies underlying the parental immunity doctrine and concluded that they were not served by barring suit by a parent against a child or by a child against a parent for negligent operation of a motor vehicle. Mindful that the uniqueness of the parent-child relationship precludes blind application of traditional negligence principles, in *Silesky* we followed the approach of *Goller v. White*, 20 Wis.2d 402, 122 N.W.2d 193 (1963), and abrogated parent-child tort immunity except in the following situations: "(1) where the alleged negligent act involves an exercise of reasonable parental authority over the child; and (2) where the alleged negligent act involves an exercise of ordinary parental discretion with respect to the provision of food, clothing, housing, medical and dental services, and other care."[2] 281 Minn. at 442, 161 N.W.2d at 638. Subsequent to the *Silesky* decision, the Supreme Court of California considered the issue of whether to retain parent-child tort immunity in *Gibson v. Gibson*, 3 Cal.3d 914, 92 Cal.Rptr. 288, 479 P.2d 648 (1971). The *Gibson* court rejected the *Goller-Silesky* approach, reasoning that its application makes arbitrary distinctions and inevitably affords parents an opportunity to act negligently within certain aspects of the parent-child relationship. The *Gibson* court agreed with the *Goller-Silesky* approach's recognition of the fact that a parent may

---

**8.** The *Baudette* court stated: "[T]he social gain of providing tangible financial protection for those whom an insured wrongdoer ordinarily has the most natural motive to protect transcends the more intangible social loss of impairing the integrity of the family relationship." 285 Minn. 371, 173 N.W.2d 419.

**9.** We note that our complete abrogation of parental immunity will not subject parents to suit for negligent child rearing. Such claims of improper parenting are not actionable on public policy grounds. *See, e. g., Burnette v. Wahl*, 284 Or. 705, 588 P.2d 1105 (1978).

**1.** *Silesky v. Kelman*, 281 Minn. 431, 161 N.W.2d 631 (1968).

**2.** In *Schenk v. Schenk*, 100 Ill.App.2d 199, 241 N.E.2d 12 (1968), the court took a similar approach, abrogating immunity except where the tortious conduct arises out of the family relationship and is directly connected to a family purpose or objective.

*Gelbman v. Gelbman*, 23 N.Y.2d 434, 297 N.Y.S.2d 529, 245 N.E.2d 192 (1969), abrogated the defense of intrafamilial immunity for negligence in New York. In *Holodook v. Spencer*, 36 N.Y.2d 35, 364 N.Y.S.2d 859, 324 N.E.2d 338 (1974), however, the court held that a child has no legally cognizable claim for negligent supervision, thereby creating a rule similar in effect to the first *Goller* exception using a different legal theory. Moreover, New York has broadly interpreted negligent supervision to include such acts as momentarily turning away from a glass of liquid caustic used to unclog drains and carrying a child across an unlit portion of a superhighway at a place not designated as a pedestrian crossing. *Addiego v. Interboro General Hospital*, 81 Misc.2d 96, 365 N.Y.S.2d 718 (1975); *Agin v. Likens*, 81 Misc.2d 690, 366 N.Y.S.2d 798 (1975).

exercise authority over a child that would be tortious if directed at a third party but accommodated that reality by adopting a modified reasonable-man standard—"what would an ordinarily reasonable and prudent *parent* have done in similar circumstances?" 3 Cal.3d at 921, 92 Cal.Rptr. at 293, 479 P.2d at 653. *Accord, Nolochek v. Gesuale,* 46 N.Y.2d 332, 413 N.Y.S.2d 340, 385 N.E.2d 1268 (1978) (Fuchsberg, J., concurring). Although the *Gibson* decision has been on the books for nearly 10 years, no jurisdiction has followed it. I would reject it for the following reasons.

The parent-child relationship is legally unique in at least two principal respects. First, a parent is required to provide his child with such necessaries as food, clothing and shelter. Second, a parent has the authority to impose the supervision, discipline and control of his child that is essential to his exercise of the socially conferred responsibility and privilege of training the child. The *Silesky* exceptions, which embrace these two special aspects of the parent-child relationship, encourage performance of parental obligations by preserving the integrity of family decisionmaking and fostering a family atmosphere of respect and trust. The exceptions implicitly acknowledge that the varied economic, educational, cultural, religious and ethnic backgrounds of parents, and the individual personalities and development paces of children result in such a multitude of permutations of parent-child relationships that no objective standard of proper child rearing is possible. While the exceptions recognize that discharge of parental functions depends on natural instinct, love and morality rather than legal sanctions, they do not assume too much by permitting parents to act negligently toward their children with impunity. Each exception contains language of limitation, i. e., the exercise of parental authority must be "reasonable," the exercise of parental discretion "ordinary." Thus I remain convinced that the parent-child relationship is a special one which the law ought to protect so long as the protection is of conduct tending to fulfill the duties and objectives of the relationship.

In my view, the *Silesky* exceptions possess major advantages over the "reasonable parent" approach. First, the objective standard encourages parents to disparage the favored American principle of freedom of choice in family matters[3] by holding out the possibility of an insurance recovery if a parent is willing to expose his conduct and judgment to public scrutiny. Second, jury verdicts based on a reasonable parent standard in this value-laden area do not inspire public confidence, since they would necessarily substitute parental judgments based upon the individual juror's views of proper or ideal child-rearing practices. The tendency toward arbitrary and intrusive standards of good parenting, which stems from the fact that most jurors have strong views in this area due to their personal experiences as parents and children, cannot be alleviated by precise instructions. The reasonable parent standard thus invites a recovery-oriented parent to gamble that a jury will find him negligent. Moreover, since the jury must consider the family context and the parent is the best, and perhaps only, witness capable of expressing the personal, cultural and socio-economic principles by which he raises his children, the danger of collusion is significant. These are not the types of claims our adversary system of factfinding is equipped to impartially resolve, and the parent's incentive for an opportunity to influence the result is so great as to further undermine the process.

Moreover, abolition of immunity is not restricted to parents who voluntarily put their conduct in issue. An estranged or divorced parent may sue on the child's behalf, thereby compelling the other parent to have his actions publicly aired and judged, adding to the acrimony normally incident to the breakup of the family unit. Such suits could be used as tools to manipulate the child's affections and to destroy loyalty to

---

**3.** *See, e. g., Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

the sued parent. Also, parents who value family privacy may decline to sue negligent third parties because our third-party procedural rules invite, if not require, their being impleaded on claims that they negligently supervised their child. To the extent that parents cannot control when they will be sued, the reasonable parent standard discourages novel child-rearing practices. In addition, it creates potential for judgments discriminating against parents whose conduct does not conform to prevailing community standards.

The most emphasized argument for abolishing the exceptions is that the prevalence of liability insurance overcomes countervailing social policy considerations. We acknowledged in both *Balts* and *Silesky* that the availability of insurance was a factor in determining whether immunity should be retained, but we emphasized that its presence was not conclusive. While most parents owning a home of necessity purchase a comprehensive homeowner's policy which includes tort liability coverage, such insurance, unlike motor vehicle liability insurance, is not made compulsory by statute. Although children whose parents are insured might be expected to prosecute their claims eagerly, vulnerability to a suit for contribution surely will make uninsured parents reluctant to assert claims against negligent third parties. Thus a child may be deterred from suing an insured person. If the child of an uninsured parent does sue a third party and the parent is ultimately held liable for contribution, family strife will surely result, especially where there are other children in the family who will suffer economic deprivation because of a sibling's recovery against the parent. Those dangers are also present where the parents are inadequately insured.

Furthermore, when a child sues his parent in Minnesota the jury is not expressly informed that an insurance company is the real party in interest. Unlike Wisconsin where by statute[4] the insurer is permitted to be named as a party defendant, our rules and statutes not only prohibit naming the insurance company but are designed to avoid prejudice believed to result if the existence of insurance is referred to other than on voir dire. If the existence of insurance is revealed in these cases, the jury is benefited in two primary ways. First, the complexion of the suit is changed from a dispute between parent and child to a claim by a child against his parent's insurance company, which claim the company has refused to pay. Second, disclosure of insurance makes clear where the true adversity lies and allows the jury to consider the credibility of the parent's testimony in its proper context. Since these advantages are not available under our statutes, I cannot agree that the presence of insurance conclusively persuades in favor of the reasonable parent standard. As I see it, the main advantage of the reasonable parent standard found by the majority is ease of judicial administration. It is incontrovertible that the *Silesky* exceptions are in some respects difficult to apply. I believe, however, that the limited protection afforded the family relationship by the exceptions has social value. By abolishing the exceptions we would make available monetary recovery to injured children; by retaining them we foster a family atmosphere in which emotional and psychological reparation can be made. At the very least, so long as the parent alone rather than the parent and his insurer is named the defendant, there still exist, in my opinion, multiple valid reasons to retain the exceptions.[5]

In both of these cases the alleged negligence consists of the failure of parents to supervise their children. I am persuaded that negligent supervision is the type of parental act contemplated by the first *Silesky* exception which provides immunity for an exercise of parental authority. In *Romanik v. Toro Co.*, 277 N.W.2d 515 (Minn. 1979), we acknowledged that courts facing

---

4. Wis.Stat.Ann. § 803.04, subd. 2 (West 1977).

5. *See* concurring and dissenting opinions in *Balts v. Balts*, 273 Minn. 419, 437, 438, 142 N.W.2d 66, 78 (1966); and in *Silesky v. Kelman*, 281 Minn. 431, 443, 161 N.W.2d 631, 638 (1968).

the issue have reached contrary conclusions. Compare Thoreson v. Milwaukee & Suburban Transport Co., 56 Wis.2d 231, 201 N.W.2d 745 (1972) with Paige v. Bing Const. Co., 61 Mich.App. 480, 233 N.W.2d 46 (1975). I find the court's reasoning in Paige compelling:

> A parent's exercise of authority over his or her child involves more than discipline. It includes the providing of instruction and education so that a child may be aware of dangers to his or her well being. We find it impossible to separate such general phenomena as authority and supervision. In order to adequately supervise a child, every parent knows that some amount of discipline is inextricably involved. The right to exercise authority over a child certainly includes the responsibility to supervise that child's behavior.
>
> \* \* \* \* \* \*
>
> Each parent has unique and inimitable methods and attitudes on how children should be supervised. Likewise, each child requires individualized guidance depending on intuitive concerns which only a parent can understand. Also, different cultural, educational and financial conditions affect the manner in which different parents supervise their children. Allowing a cause of action for negligent supervision would enable others, ignorant of a case's peculiar familial distinctions and bereft of any standards, to second-guess a parent's management of family affairs considerably beyond these statutory protections.

61 Mich.App. at 486, 233 N.W.2d at 48–9. See Bell v. Schwartz, 422 F.Supp. 257 (D.Minn.1976). I would hold that where the alleged negligent conduct is a parent's failure to supervise his child the parent is immune under the "parental authority" exception if, as here, the omission is not outrageous.

SHERAN, Chief Justice (dissenting).

I agree with the dissent of Justice Rogosheske.

OTIS, Justice (dissenting).

I agree with the dissent of Justice Rogosheske.

PETERSON, Justice (dissenting).

I agree with the dissent of Justice Rogosheske.